## A01A2270. WOLTER v. WAL-MART STORES, INC.
(559 SE2d 483)

BLACKBURN, Chief Judge.

After a retail store operated by Wal-Mart Stores, Inc. refused to accept his debit card for a sales transaction, Robert J. Wolter sued Wal-Mart and First Union National Bank, the issuer of the card. The trial court granted First Union's motion to dismiss and awarded sum-

---

mary judgment to Wal-Mart. In this appeal, Wolter challenges the grant of summary judgment in favor of Wal-Mart on his claim for tortious misconduct. Since no evidence showed that Wal-Mart's conduct constituted the requisite level of abusive, opprobrious, and insulting mistreatment as required by that tort, we affirm.

When viewed in the light most favorable to Wolter as the non-movant, the evidence showed that Wolter and Robby L. Duty owned and operated a business known as the Jeffobby Company. While vacationing in Florida, Duty lost his wallet at a gas station. This wallet contained various financial transaction cards including Wolter and Duty's joint business and personal accounts with First Union. Following an unsuccessful search, Duty "started calling credit card companies and canceling cards." Duty testified that he told a representative of First Union that he needed to cancel his personal card and his business card. Although the business card had been issued to Jeffobby, Wolter and Duty had separate cards in their respective names with different numbers drawn on the same business account. By Wolter's recollection, he and not Duty had telephoned First Union to cancel the cards. According to Wolter, he reported the missing wallet to First Union and told the bank's representative that "we needed to stop two debit card numbers."

On the following day, Wolter went to a Wal-Mart store in Newnan, Georgia, to purchase some items for the cleaning business. When Wolter tried to use his Jeffobby business card issued by First Union, he was unable to do so. When Wolter swiped his debit card at the checkout, the cashier said, "we have got a code. I have got to call a supervisor." After turning on her light, the cashier summoned her supervisor. Apprised of the code problem, the supervisor left to make a telephone call. While she was doing so, Wolter described the events of the preceding day involving the lost wallet to the cashier whom he described as "friendly" and sympathetic to his plight. He admitted that the cashier did not do or say anything to embarrass him. After completing the phone call, as the supervisor walked back toward the register, and, according to Wolter, she said, "your bank has said the card is stolen." "Pick his card up. He's using a stolen credit card." At this point, Wolter informed the supervisor about the lost wallet incident, and she then suggested, "well, let me go get somebody." Although she asked Wolter "to wait for a few minutes for her to get somebody," he refused. Instead, he paid cash for his purchases and left the store still in possession of his debit card.

From the parking lot, Wolter contacted First Union on his cell phone and demanded to know "what's going on, my card has just been declined." After comparing account numbers, the First Union representative determined that "they had accidentally stopped my card" instead of Duty's. The representative explained that the first

names on the cards were similar, "Robert" and "Robby," and that the business card in the name of Robert Wolter had been stopped by mistake. She discovered that First Union had stopped Duty's personal card and Wolter's business card. The next day, First Union sent a letter to apologize for its error. According to the letter, "[u]nfortunately, your card account was closed instead of your partner's card account, because a card on this account was reported lost. We have since reissued cards on this account and the account is in good standing."

After the incident at Wal-Mart, Wolter sued Wal-Mart and First Union. Wolter alleged that he had been unlawfully detained by Wal-Mart's employees and "detained against his will." He alleged that "Wal-Mart's employees publicly and loudly announced so others could hear that [I] was attempting to use a stolen check card." Wolter further claimed that "Defendant First Union and Defendant Wal-Mart's employees exercised bad faith in falsely and maliciously accusing Plaintiff of using a stolen check card after Plaintiff explained the situation." Wolter claimed that he suffered embarrassment and ridicule in public view. He alleged that both defendants were liable for false imprisonment and tortious misconduct.

First Union sought to be dismissed from the suit and moved for summary judgment as did Wal-Mart. The trial court dismissed First Union without prejudice and granted summary judgment to Wal-Mart. In finding for Wal-Mart, the trial court noted that Wal-Mart "acted upon information legitimately received indicating the Plaintiff's credit card was not valid and the Court finds that Wal-Mart, Inc. was not negligent or reckless in this regard."

In this appeal, Wolter contends that the trial court erred in granting summary judgment to Wal-Mart on his claim for tortious misconduct.[1] He claims that the only evidence presented to the trial court showed that Wal-Mart had absolutely no basis to publicly and falsely accuse him of using a stolen bank card. Wolter alleges that the supervisor's remarks and the manner in which she uttered them constituted unjustifiable abuse and were insulting and embarrassing to him. Wolter contends that the supervisor created the impression that he was attempting to commit credit card fraud. He also claims that First Union never directed Wal-Mart to confiscate his card.

Tortious misconduct is based upon the principle that one who owns a mercantile establishment and sells goods

> owes a duty to a customer [who is] lawfully in his store by his implied invitation for the purpose of transacting business, to protect the customer against the use of any unprovoked and

---

[1] First Union is not a party to this appeal.

unjustifiable opprobrious and insulting and abusive words by a clerk employed by him to deal with customers, tending to humiliate, mortify, and wound the feelings of the customer.

*Davis v. Rich's Dept. Stores*.[2] A claim for tortious misconduct may arise when a customer-invitee who is on the premises to transact business becomes "subjected to abusive, opprobrious, insulting, or slanderous language by an agent of the invitor." *Carter v. Willowrun Condo. Assn*.[3] This theory of liability rests not upon slander "but on the theory that a business inviter owes a public duty to protect its invitees from abusive language and conduct." *Swift v. S. S. Kresge Co*.[4]

Here, the evidence shows that due to an error, First Union mistakenly cancelled Wolter's debit card. First Union's representative, Tina Clark, after reviewing the bank's transaction logs, testified that when the status on Wolter's card changed from active to lost, the card would have been universally declined. When First Union placed the "lost" status on the debit card, that meant that this card could no longer be used for any financial transaction. Clark explained that when a "lost/stolen event" is entered into the national clearinghouse system known as the Visa Debit Processing Service ("VDPS"), merchants subscribing to the service will receive that information. A computer printout indicates that Wolter's debit card was "swiped" at 5:26 p.m. and 5:29 p.m. and two different codes appeared. One code meant "unauthorized usage" at First Union but equated to the VDPS "restricted card" code. The other code meant "invalid card" at First Union but equated to the VDPS "[d]o not honor!" code. Clark also testified that had First Union wanted anyone "to capture" the card, then a different code would have been assigned.

As a result of First Union's error, when the supervisor at Wal-Mart attempted to verify the status code for the debit card, the VDPS system indicated "unauthorized usage" and "invalid card" which translated as "do not honor." And yet, the evidence is undisputed that Wolter made no attempt to explain to the supervisor what he suspected had occurred until after she had left to verify the status code. The record, including Wolter's testimony, contains no evidence that the Wal-Mart supervisor acted out of a desire to harm him or that she was not motivated by a desire to protect the store's property. Compare *Revco Discount Drug Centers &c. v. Famble*[5] (store clerk

---

[2] *Davis v. Rich's Dept. Stores*, 248 Ga. App. 116, 119 (2) (545 SE2d 661) (2001).

[3] *Carter v. Willowrun Condo. Assn.*, 179 Ga. App. 257, 259 (3) (345 SE2d 924) (1986).

[4] *Swift v. S. S. Kresge Co.*, 159 Ga. App. 571, 572 (2) (284 SE2d 74) (1981).

[5] *Revco Discount Drug Centers &c. v. Famble*, 173 Ga. App. 330, 331-332 (4) (326 SE2d 532) (1985).

made loud, angry, and false accusations of shoplifting against plaintiff in front of other customers). In fact, Wolter conceded that he did not think that the supervisor was singling him out for mistreatment or acting maliciously. At no point did she yell or shout. When Wolter was asked, "now, when [the supervisor] made [the] statement to the cashier . . . was she actually addressing the cashier when making that statement, or was she sort of announcing it to the whole store?" he responded, "[i]t looked like she was announcing it to me that she had caught me and at the same time announcing it to the cashier to pick it up." Although Wolter speculated that the customer behind him at the checkout and her young son might have overheard the supervisor's remarks, he also testified that this same customer had likely heard his explanation to the cashier. And, despite admitting that he had a pretty good idea as to why the problem arose, Wolter did nothing to alert the supervisor to the possibility of a mistake on the part of the bank.

As he conceded during his deposition, Wolter's sole complaint against Wal-Mart hinges on the supervisor's conduct in that he believed that she should have used a quieter tone of voice and should have waited until she was closer to the cashier to report the problem. Wolter felt that "she was looking at me [i]n a questionable manner." He noted that she "seemed a little confused" and "had an odd look on her face." But at no point did the supervisor or anyone else accuse Wolter of committing a crime or threaten to arrest him. He conceded that she did not make any disparaging remarks or inappropriate comments to him. Although Wolter assumes that someone other than the customer behind him overheard the supervisor, he has not been able to identify anyone as a possible witness to the event and he admitted that he did not look around to see whether anyone was looking. Compare *Simmons v. Kroger Co.*[6]

Although Wolter correctly argues that OCGA § 51-7-60 did not apply to the conduct at issue here, summary judgment was nevertheless warranted. *Simmons v. Kroger Co.*, supra at 724 (2). After the warning code appeared on the computer terminal at the checkout, the supervisor attempted to ascertain the validity of the debit card, only to be misinformed as to the card's proper status. See *Taylor v. Super Discount Market*[7] (cashier mistakenly believed that a $20 bill dated 1950 and in excellent condition that lacked the words "In God We Trust" was counterfeit). Although the supervisor obtained erroneous information, she, nonetheless, had a legitimate basis to believe that the card might well have been stolen. See id. Although the

---

[6] *Simmons v. Kroger Co.*, 218 Ga. App. 721, 724 (2) (463 SE2d 159) (1995).

[7] *Taylor v. Super Discount Market*, 212 Ga. App. 155, 157 (441 SE2d 433) (1994).

supervisor could perhaps have been more tactful in handling this situation, the conduct alleged does not rise to the level of "unprovoked and unjustifiable opprobrious and insulting and abusive words by an employee tending to humiliate, mortify, and wound the feelings of the customer." (Punctuation omitted.) *Mitchell v. Lowe's Home Centers.*[8] Since the evidence does not show that Wolter was subjected to abusive, opprobrious, insulting, or slanderous language by an agent of Wal-Mart, summary judgment in favor of defendant Wal-Mart was proper. See *Fly v. Kroger Co.*[9]

*Judgment affirmed. Pope, P. J., and Mikell, J., concur.*

DECIDED JANUARY 14, 2002 —
RECONSIDERATION DENIED JANUARY 30, 2002 —

*Helms & Helms, Jack J. Helms, Jr.*, for appellant.
*McLain & Merritt, W. Anthony Moss*, for appellee.

[8] *Mitchell v. Lowe's Home Centers*, 234 Ga. App. 339, 343 (3) (506 SE2d 381) (1998).
[9] *Fly v. Kroger Co.*, 209 Ga. App. 75, 78 (3) (432 SE2d 664) (1993).