### A03A1384. MEANS v. CITY OF ATLANTA POLICE DEPARTMENT et al.
(586 SE2d 373)

MIKELL, Judge.

Michael Means filed the underlying action against Sydell, Inc., d/b/a Spa Sydell ("Sydell, Inc.") and Richard Blahnik asserting claims

---

of defamation, malicious prosecution, and false imprisonment. Means later added the City of Atlanta Police Department, Chief Beverly Harvard, and Detective Shirley Eppinger and amended his complaint to assert claims for violations of 42 USC § 1983 and the Fourteenth Amendment. Means dismissed his claims against Sydell, Inc. and Blahnik. The trial court granted summary judgment to the remaining defendants. Means appeals. For reasons explained below, we affirm.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the non-moving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. . . . Our review of an appeal from summary judgment is de novo.

(Citations omitted.) *Vasquez v. Smith*, 259 Ga. App. 79 (576 SE2d 59) (2003). See also *Willett v. Russell M. Stookey, P.C.*, 256 Ga. App. 403, 410 (568 SE2d 520) (2002).

Viewed in favor of Means as the nonmoving party, the record shows that in May 1999, former defendant Sydell, Inc., owned and operated several spas in the Atlanta area including a spa located at 3060 Peachtree Road, Atlanta, Georgia ("Buckhead Spa Sydell"). Means, a black male, and owner of a Jani-King franchise, provided cleaning and janitorial services to Buckhead Spa Sydell. On Monday, May 10, 1999, Paul Miller, front desk supervisor for Buckhead Spa Sydell, discovered that a weekend deposit of funds in the approximate amount of $6,000 was missing from a locked cabinet where deposits were held until they could be deposited the following business day. Miller reported his discovery to management, who then reported it to Blahnik, executive director of operations for Sydell, Inc. Blahnik's duties at Sydell, Inc., included "loss prevention."

During his investigation, Blahnik identified Tima Aimbez as the cashier responsible for the deposit, confirmed that approximately $2,000 in cash and $4,000 in checks was missing, and discovered that ceiling tiles, which concealed a security camera in the front checkout area, had been disturbed. Only Blahnik and the director of Buckhead Spa Sydell knew about the security camera. Even though the security camera was operational in May 1999, it had not been turned on the evening of May 8, 1999. Blahnik testified that 12 people had

master keys which allowed access to the locked office and locked cabinet; all 12 of these people were Caucasian. Blahnik interviewed Aimbez, Miller, and the five managers who had master keys; Blahnik did not interview the executive officers of Sydell, Inc. who had grand master keys to all spa locations. In his report, Blahnik noted that Aimbez observed one deposit bag while placing the second inside the cabinet. Aimbez then locked the cabinet and office door and exited. During his interview of Bridgette Linder, opening manager on the morning of Sunday, May 9, 1999, Blahnik learned that Linder recalled seeing only one bag of deposits. According to Blahnik there should have been two deposits on Sunday morning since Buckhead Spa Sydell runs two registers on Saturdays and Sundays' deposits are not reconciled until Monday morning.

Blahnik also interviewed Means, who had cleaned the building on the night of May 8, 1999. An investigative report prepared by Blahnik named Means as the prime suspect in the theft. According to this report, Blahnik's accusation was based on the following observations: (1) even though he had never been given a single detail about the incident, Means knew the amount of cash allegedly stolen; (2) he knew the incident took place on Saturday evening; and (3) he claimed to have observed several ceiling tiles out of place that Saturday evening. Further, Means was the only person in the building the night of May 8, 1999, and his body language during the interview was very suspicious. Finally, even though he was neither accused nor informed that he was a suspect until after Blahnik discovered that Means had mistakenly been given a master key, Means requested an attorney at least three times during and after the interview.

According to Means' recollection of the interview with Blahnik, Means did not feel intimidated, and he asked to consult with an attorney only once during the interview and never spoke to Blahnik again. Means also denied making any of the statements noted by Blahnik in his investigative report. Means recalled mentioning to Blahnik that a ceiling tile in the back area of the building was out of place.

Sandy Benton, finance manager for Sydell, Inc., reported the theft to the City of Atlanta Police Department ("APD") on May 10, 1999. The report was assigned to Eppinger, a 19-year veteran detective of the APD. On May 12, 1999, Blahnik faxed to Eppinger a copy of his investigative report, which implicated Means as the prime suspect. Blahnik also implicated Means during a telephone conversation with Eppinger. During her investigation, Eppinger did not visit Buckhead Spa Sydell and did not conduct any interviews.

Believing that she had probable cause to issue an arrest citation, Eppinger called Jani-King and left a message for Means. Means returned the call and told Eppinger to contact his attorney. Eppinger

explained the situation to Means' attorney who agreed to a court date in order to obtain fingerprints. On May 28, 1999, Eppinger issued an arrest citation for Means. Eppinger testified that she used what she had been told by Blahnik as well as Blahnik's report as probable cause to issue the arrest citation. According to Eppinger, at the time the arrest citation was issued, Eppinger was not required to go before a magistrate. Eppinger then contacted Means by telephone to advise him of the arrest citation.

According to Means, Eppinger told him to come pick up the citation or a warrant for his arrest would be issued; Eppinger testified that she never called Means to demand that he come pick up the arrest citation. Later that day, Means and his wife went to the police department to pick up the citation; Means was not handcuffed, taken into custody, or interrogated. Means and his attorney appeared for an initial hearing on June 14, 1999. It appears that hearing was rescheduled. Several days later Means and his attorney appeared at a second hearing, at which time Means agreed to waive the preliminary hearing.[1] Means was then processed by police and placed in a holding cell to await photographing and fingerprinting. Means remained in the cell for eight to ten hours until he was released on his own signature bond.

Means continued to clean the building until Buckhead Spa Sydell terminated his contract in June 1999. On May 11, 2000, Means was indicted by the grand jury for theft by taking. In June 2000, his case appeared on a plea and arraignment calendar. On July 17, 2000, Means was told that his criminal case had been dead docketed.

Means filed suit against Sydell, Inc. and Blahnik on April 14, 2000. On July 18, 2001, the trial court granted Means' motion to join APD, Harvard, and Eppinger as defendants; Means filed an amended complaint adding these defendants on October 3, 2001. On November 8, 2001, Means dismissed with prejudice defendants Sydell, Inc., d/b/a Spa Sydell and Blahnik. The remaining defendants filed a motion for summary judgment on August 7, 2002, and the trial court granted it, concluding that (1) the APD is not a legal entity capable of being sued; (2) Means' 42 USC § 1983 claim fails because there has been no showing of a pattern, practice, or policy of the municipality which gives rise to the alleged injury; (3) the city is immune for the torts of its police employees under OCGA § 36-33-3; (4) the individual defendants are entitled to official immunity under OCGA § 36-33-4 because there is no evidence of wilfulness, fraud, malice, or a know-

---

[1] The record is not clear, but it appears the preliminary hearing was a probable cause hearing: Eppinger testified that there was no probable cause hearing in this matter because Means waived the hearing.

ing wrongful act; and (5) there is no evidence Means complied with the ante litem notice requirements of OCGA § 36-33-5.

1. Means' brief makes no argument about the viability of his state claims against any of the defendants in their official or individual capacities; therefore, we will not address this issue and will assume that Means agrees with the trial court's ruling on this issue.[2] Accordingly, we only address Means' claims under 42 USC § 1983.

2. In his enumeration of errors, Means argues that even though the City of Atlanta was not specifically named in the lawsuit it is still liable because a suit against an official in his or her official capacity is a claim against the municipality. Therefore, by raising a claim against Harvard and Eppinger, he has sufficiently raised a claim against the City of Atlanta. Further, because he was arrested without probable cause in violation of the Fourth and Fourteenth Amendments of the U. S. and Georgia Constitutions, Means should be allowed to proceed with his claim under 42 USC § 1983.

We agree that even though the City of Atlanta is not a named defendant in this action, Harvard and Eppinger were sued in their official capacities; therefore, Means' claims are, in essence, claims against the City of Atlanta. See *Gilbert v. Richardson*, 264 Ga. 744, 746 (2), n. 4 (452 SE2d 476) (1994). We also agree with defendants that Harvard and Eppinger may raise any defense available to the city, including the defense of sovereign immunity under OCGA §§ 36-33-1 (b) and 36-33-3. However, as previously discussed, since Means' only remaining claim involves a violation of 42 USC § 1983, we need not address the defense of sovereign immunity under OCGA §§ 36-33-3 and 36-33-1. See *Davis v. City of Roswell*, 250 Ga. 8, 9 (1) (295 SE2d 317) (1982) (where a federal right of action is asserted, it is controlled by federal law; accordingly, "[t]he supremacy clause of the Constitution prevents us from construing the federal rule to permit a state immunity defense").

42 USC § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities

---

[2] It is not clear from Means' pleadings whether he intended to assert any state claims against these defendants; assuming that he did, we presume that Means does not dispute the trial court's finding that he failed to comply with the ante litem notice requirements of OCGA § 36-33-5, which apply to all of his state claims but not his claim pursuant to 42 USC § 1983. See OCGA § 36-33-5 (a). See also *Dover v. City of Jackson*, 246 Ga. App. 524, 526 (2) (541 SE2d 92) (2000) ("the ante litem notice requirement of OCGA § 36-33-5 does not apply to actions filed pursuant to 42 USC § 1983") (footnote omitted).

secured by the Constitution and laws, shall be liable to the party injured. . . .

To survive summary judgment in a § 1983 action, a plaintiff must demonstrate the existence of genuine issues of material fact showing that the defendants' acts or omissions, performed under color of state law, resulted in the deprivation of a right, privilege, or immunity protected by the United States Constitution or the laws of the United States. See *Flagg Bros., Inc. v. Brooks*, 436 U. S. 149, 156-157 (98 SC 1729, 56 LE2d 185) (1978); *Davis*, supra. A municipality such as the City of Atlanta is a person under the statute and may be held accountable if the deprivation of rights alleged was the result of a municipal policy or custom; however, a municipality may not be held liable under the statute solely on negligence or respondeat superior theories. *Monell v. Dept. of Social Svcs. of the City of New York*, 436 U. S. 658, 690-691 (98 SC 2018, 56 LE2d 611) (1978); *Davis*, supra.

Means contends he was arrested without probable cause in violation of the Fourth and Fourteenth Amendments of the United States Constitution and similar provisions of the Georgia Constitution. Means makes no argument and offers no proof that the city had a policy or custom of arresting individuals without probable cause.[3] Accordingly, Means may not pursue a claim against the city pursuant to 42 USC § 1983.

"Government officials performing discretionary functions[4] are granted a qualified immunity shielding them from imposition of personal liability pursuant to 42 USC § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Citation and punctuation omitted.) *Thomas v. Holt*, 221 Ga. App. 345, 347-348 (1) (471 SE2d 300) (1996). "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." (Citation and punctuation omitted.) *Maxwell v. Mayor &c. of Savannah*, 226 Ga. App. 705, 707 (1) (487 SE2d 478) (1997). "In all but the most exceptional cases, qualified immunity protects govern-

---

[3] Even though a single decision by municipal policymakers, or a single implementation of municipal policy or custom by a municipal employee, may be sufficient to establish that a municipal policy or custom caused the alleged deprivation, municipal liability may not be imposed pursuant to 42 USC § 1983 for a single incident of unconstitutional conduct by a municipal employee without proof that the conduct was taken pursuant to a municipal policy or custom. *Pembaur v. City of Cincinnati*, 475 U. S. 469, 478-482 (106 SC 1292, 89 LE2d 452) (1986).

[4] The parties do not dispute that Eppinger was performing a discretionary function when she issued the arrest citation in this case.

ment officials performing discretionary functions from the burdens of civil trials and from liability for damages." (Citation and punctuation omitted.) *Bd. of Commrs. of Effingham County v. Farmer*, 228 Ga. App. 819, 823 (2) (493 SE2d 21) (1997).

"Probable cause exists where 'the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." (Punctuation omitted.) *Draper v. United States*, 358 U. S. 307, 313 (79 SC 329, 3 LE2d 327) (1959), citing *Carroll v. United States*, 267 U. S. 132, 162 (45 SC 280, 69 LE 543) (1925). The appropriate standard when determining if an officer is entitled to qualified immunity under 42 USC § 1983 is not whether there was actual probable cause, but whether there was "arguable" probable cause. *Pickens v. Hollowell*, 59 F3d 1203, 1206 (11th Cir. 1995).

To the extent Means' complaint states a cause of action pursuant to 42 USC § 1983 seeking to impose personal liability on Eppinger for issuing an arrest citation against Means, the evidence discussed above shows that the facts known to Eppinger at the time she issued the arrest citation were sufficient to warrant the belief that Means committed the theft. Eppinger was an experienced detective, who relied on a trustworthy source to establish probable cause. That source — Blahnik — conducted a lengthy and thorough investigation into the theft and concluded that Means was the prime suspect. In his report, Blahnik listed nine reasons for suspecting Means. There were no witnesses to the theft and the victim in the case was Buckhead Spa Sydell. Accordingly, we do not find it unreasonable for Eppinger to base her issuance of an arrest citation on the statement and report of the corporate executive responsible for loss prevention. For these reasons, we cannot conclude that Eppinger's failure to visit the scene, dust for fingerprints, or conduct interviews of witnesses and/or potential suspects was tantamount to a violation of Means' constitutional rights. Moreover, the evidence shows that Means waived a preliminary/probable cause hearing and was indicted by the grand jury. Therefore, we conclude that Means has not introduced sufficient evidence tending to show a constitutional violation under 42 USC § 1983 in connection with his arrest. The trial court did not err in granting summary judgment on Means' § 1983 claim.

*Judgment affirmed. Johnson, P. J., and Eldridge, J., concur.*

DECIDED AUGUST 12, 2003.

*Phyllis A. Watkins, Walter L. Fortson*, for appellant.

*Linda K. DiSantis, Jerry L. DeLoach, Serena L. Sparks, Franklin W. Thomas, Jr.*, for appellees.