A05A1836. ADAMS et al. v. CARLISLE et al.
A05A1837. ADAMS et al. v. EVANS et al.
A05A1838. ADAMS et al. v. WALLACE et al.

(630 SE2d 529)

MIKELL, Judge.

These appeals arise out of the trial court's grant of summary judgment to numerous defendants, all of whom were sued in connection with the false arrests of Brenda Adams and Sharon Elliott ("appellants") at the North Georgia Premium Outlet Mall (the "Mall") in Dawson County. In their complaint, Adams and Elliott alleged several causes of action, including, but not limited to, false arrest,

false imprisonment, malicious prosecution, intentional infliction of emotional distress, slander, and tortious misconduct, and they sought punitive damages in connection therewith. In Case No. A05A1836, the appellees are Corporal P. Chase Johns, individually and in his official capacity, Investigator William Miller, individually and in his official capacity, and Billy Carlisle, in his official capacity as Dawson County Sheriff. In Case No. A05A1837, Le Gourmet Chef ("LGC") and its employees, Glenda K. Evans and Gabriel Blackburn, are the named appellees. Finally, in Case No. A05A1838, the appellees are CPG Partners, L.P., d/b/a North Georgia Premium Outlet Mall ("CPG") and its security guards, Jerry M. ("Bobby") Wallace and Michael D. Grayson. We affirm the trial court's grant of summary judgment to Johns, Miller, and Carlisle in Case No. A05A1836. In Case No. A05A1837, we affirm the grant of summary judgment to Blackburn as to all of appellants' claims and to LGC and Evans on appellants' claims of negligence, slander, tortious misconduct, and punitive damages but reverse as to appellants' claims for false arrest, false imprisonment, and malicious prosecution as to LGC and Evans. Finally, in Case No. A05A1838, we affirm the grant of summary judgment to Wallace as to all of appellants' claims and to CPG and Grayson on appellants' claims of negligence but reverse on appellants' false imprisonment, false arrest, malicious prosecution, intentional infliction of emotional distress, and punitive damages claims as to CPG and Grayson.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the non-moving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of the plaintiff's case. . . . Our review of an appeal from summary judgment is de novo.[1]

Viewed most favorably to Adams and Elliott, the record shows that appellants were shopping at LGC (appellee in Case No. A05A1837) at the Mall on March 3, 2002, when Elliott used a $20 bill to pay for

---

[1] (Citations and punctuation omitted; emphasis in original.) *Hannah v. Hampton Auto Parts*, 234 Ga. App. 392 (506 SE2d 910) (1998). See also *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

some items. Evans (also an appellee in Case No. A05A1837), who was a cashier at LGC on the day in question, deposed that she was required to mark all $20, $50, and $100 bills with a counterfeit detection pen; that Elliott's $20 bill looked suspicious; that she marked the bill with the pen and based upon the color of the mark on the bill, which was either black or dark brown, she concluded that it was counterfeit; and that she told Elliott that she could not accept the bill because it was counterfeit. Elliott then gave her another bill, which Evans also marked and determined was counterfeit. Elliott then summoned the store manager, Blackburn (also an appellee in Case No. A05A1837).

Blackburn deposed that he was not sure that the money was counterfeit so he asked Elliott for her name and address and informed her that he would keep the merchandise and the money and would mail the items to her if the bank verified that the bills were authentic. In his statement to police, however, Blackburn stated that he told Elliott that the bill appeared to be counterfeit and that the store could not accept it; that his suspicions were based upon the fact that the pen's mark on the bill turned brown; and that Elliott insisted that the bills were authentic.

Elliott deposed that Blackburn informed her that he would have to take the money to the bank to verify its authenticity; that she told him that the money was not counterfeit but gave him her name and phone number to contact her after going to the bank so that she could return to pick up her money; and that she and Adams left the store without objection from Blackburn or Evans. Elliott further deposed that she and Adams continued to shop until they noticed security guards following them. Once Adams and Elliott reached their car, the security guards and the police approached them.

Evans testified that after the appellants left the store, she called the Mall's security personnel, pursuant to Blackburn's instructions, and advised them that the women were passing counterfeit bills. Security guards Grayson and Wallace (appellees in Case No. A05A1838) responded to the call, and Evans pointed out the two women to them. Grayson told Evans to call the police, followed the women, and told Wallace to go to the food court to wait on the police. When the sheriff's deputy arrived, Grayson pointed to the car that Adams and Elliott were entering, and Corporal Chase Johns (appellee in Case No. A05A1836) pulled up behind the car. A video camera in Corporal Johns's car recorded the entire incident.

The transcript of the ensuing conversation shows that after Corporal Johns asks Adams and Elliott for their identification, he asks who has the money, and Elliott replies that she does. Elliott explains that the bills are old and had belonged to her 86-year-old father-in-law; and she gives the officer her remaining $20 bills.

Grayson then interjects: "I'm having the woman from Gourmet Chef meet us at the information booth. She's got the counterfeit pencil and the other bills."[2] Corporal Johns responds, "Man, I hate this because I'm not an expert at this" then explains to Adams and Elliott that he has to investigate the matter. Corporal Johns radios the investigator on call, Miller (also an appellee in Case No. A05A1836), reports to him that there are "different sizes between the ink line and the edge of the paper," repeats that he is not an expert on counterfeit bills, then reiterates that his only concern is that the bill is offset. Miller advises Johns to arrest Elliott. By this time, Evans is at the scene.

Johns states to Miller: "Okay. Just go on what I've said, on the size?" Johns then inquires as to whether anyone present has a $20 bill, and Grayson replies that he does. Miller instructs Johns to gather all of the bills, then Johns asks Miller if he can use one of the markers to check the bills. At that point, Evans interjects to instruct Johns on how the pen works. Grayson suggests that Johns use the pen on one of Grayson's bills and then asks Johns if he sees the difference. Miller asks who kept the marker. Johns then tells him that Evans is with them outside and that she wrote on the security guard's bills and the mark was yellow, and then on Elliott's bills, and the mark was brown. Miller then says, "What does that mean, the brown is counterfeit?" and then tells Johns that he has probable cause to arrest Elliott for forgery. Miller also advises Johns to ask Adams to consent to a search of her purse.

Before Johns arrests Elliott, however, Evans continues to talk to Johns, telling him that the colors on the bills appear funny. Evans then calls Grayson over to where she is talking to Johns and the following conversation ensues:

> CORPORAL JOHNS: [S]ee it's offset on the printing and everything.
> MS. EVANS: Uh-huh.
> CORPORAL JOHNS: Tell Mike — Mike, let me see your wad of money, Mike.
> MS. EVANS: Look at the dates on them. All right. These are —
> CORPORAL JOHNS: Give me any bills, just any two or three bills, just don't — separate which ones are which.
> MS. EVANS: All right. These are the ones she gave me.
> CORPORAL JOHNS: Okay. Yeah, they're all identical, every one of them you gave me.

---

[2] Johns deposed that the security guard with whom he had interaction at the scene was Grayson.

MS. EVANS: Right. How many twenty-dollar bills will you find with the 1950 dates on them?

CORPORAL JOHNS: Well, see, she said he's been saving them but — okay.

MS. EVANS: Damn, Chase . . .

CORPORAL JOHNS: Well, I'm just trying to make sure I got all my ducks in a row.

MS. EVANS: Well, I understand that.

Johns asks Evans and Blackburn to give him written statements about the incident and then places Elliott under arrest.

Corporal Johns asks Adams to look at the bills in her wallet, and she consents.

Johns then sends Wallace, the other security guard, into the store to get a detection pen from Evans, who had left the scene by that time. Johns reports to an unidentified officer that Adams's money also appears to be counterfeit based on the color of ink from the pen and that it does not feel right, is not square, and has a strange watermark. He then radios Miller and asks him to come to the scene.

When Miller arrives, he looks at the bills and says "they're bogus as hell." Miller also searches Adams's purse and finds prescription medications that were not contained in their original containers. Adams and Elliott were charged with forgery, and Adams was also charged with violating OCGA § 16-13-75, which requires that prescription drugs be kept in their original containers.

On April 24, 2002, Captain Steven Hawk, the evidence custodian and expert on counterfeit bills for the Dawson County Sheriff's Office, inspected the bills for their authenticity and found that the bills were genuine. Consequently, all of the charges against Adams and Elliott were dropped on September 13, 2002.

## Case No. A05A1836

The trial court granted summary judgment to Carlisle, Johns, and Miller on appellants' federal claims for unlawful search and seizure, false arrest, and failure to train and supervise as well as their state claims for malicious prosecution, false imprisonment, and false arrest. The trial court also found that the claims against the officers in their individual and official capacities were barred by the doctrines of qualified and official immunity, respectively. On appeal, however, appellants assert only two enumerations of error: (1) they were arrested without probable cause; and (2) the trial court failed to consider Sheriff Carlisle's failure to train his deputies in its probable

cause analysis, which, from the content of appellants' brief, appear to relate to their state claims of malicious prosecution, false arrest, and false imprisonment.

1. Appellants argue that they were arrested without probable cause. For the reasons stated below, we disagree.

> The focus in a probable cause inquiry is " 'whether the facts *as they appeared at the time of instituting the prosecution* were such as to lead a person of ordinary caution to entertain a belief that the accused was guilty of the offense charged.' " In other words, the question is, not whether plaintiff was guilty, but whether defendants had *reasonable cause to so believe* — whether the circumstances were such as to create in the mind of defendants a *reasonable belief* that there was probable cause for the arrest and prosecution. Probable cause is defined to be the existence of such facts and circumstances as would excite the *belief* in a reasonable mind, that the person charged was guilty of the crime for which he was arrested and prosecuted.[3]

"Conversely, lack of probable cause shall exist when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused."[4] Though a jury ordinarily decides whether probable cause exists in malicious prosecution actions, a judge may determine the issue when the material facts are undisputed.[5] Here, the material facts as to the determination of probable cause are undisputed.

In accordance with the standard set forth above in *McNeely v. Home Depot*,[6] the officers had reasonable cause to believe that there was probable cause to arrest and prosecute the appellants based on the facts as they appeared at the time of the institution of the prosecution against them. The officers did not rely solely upon the results of the pen test. Johns and Miller both deposed that they had received some on-the-job training on the detection of counterfeit bills. Miller stated that he was aware that the color of the mark made on a suspected bill by a counterfeit pen was an indication of the bill's

---

[3] (Punctuation and footnotes omitted; emphasis in original.) *McNeely v. Home Depot*, 275 Ga. App. 480, 482 (621 SE2d 473) (2005).

[4] (Citation and punctuation omitted.) *Horne v. J. H. Harvey Co.*, 274 Ga. App. 444, 447 (617 SE2d 648) (2005).

[5] *Ye v. Kroger Co.*, 252 Ga. App. 712, 713 (1) (556 SE2d 879) (2001). See also *Condon v. Vickery*, 272 Ga. App. 381, 382 (612 SE2d 574) (2005).

[6] Supra.

authenticity, but that he was also concerned that the bill was counterfeit because the layout was not centered and the bills had a funny color. On the videotape, Johns repeatedly voiced his concern that the bill was not centered, which was one of the things he had been trained to consider when attempting to detect counterfeit currency. There was also evidence that Johns and Miller had been advised by investigators from the Dawson County Sheriff's Department that counterfeit currency was being passed in the county, frequently at the Mall.

The appellants focus on the fact that neither Johns nor Miller knew that the drimark pens did not work on bills older than 1959, as evidence of a lack of probable cause. However, we do not find this fact particularly pertinent to our analysis as it, standing alone, does not rule out the possibility that the bills appeared counterfeit. In other words, a savvy counterfeiter could present bills that predated 1959 to a retailer and use this argument to his or her benefit to explain the color of the mark produced by the pen.

Regarding the charge against Adams for possessing prescription medications that were not in their original containers, Adams consented to the search, and consent eliminates the need for a finding of probable cause.[7] Accordingly, we find no error in the trial court's conclusion as a matter of law that probable cause for the arrest existed at the time of the incident and its consequent decision to grant summary judgment in favor of Carlisle, Johns, and Miller.[8]

2. Appellants also argue that the trial court failed to consider Carlisle's failure to train his deputies as a part of its probable cause analysis. As stated earlier, in these instances, the probable cause determination depends upon the facts as they existed at the initiation of the prosecution.[9] In light of the finding in Division 1 that probable cause existed to make the arrest, the issue of whether the officers were properly trained on the detection of counterfeit bills is rendered moot.

*In sum, we affirm the grant of summary judgment to the appellees on plaintiffs' claims of false arrest, false imprisonment, and malicious prosecution.*

---

[7] See *Underwood v. State*, 218 Ga. App. 530 (1) (462 SE2d 434) (1995).

[8] Appellants argued in their brief but failed to enumerate as error their claim that the officers were not entitled to qualified immunity because they violated appellants' constitutional rights by arresting them without probable cause. "An appellant cannot use an appellate brief to expand his or her enumeration of errors by arguing the incorrectness of a trial court's ruling not mentioned in the enumeration. Appellate review cannot be enlarged or transformed through switching, shifting, or mending one's hold." (Citations and punctuation omitted.) *Wright v. Dept. of Natural Resources*, 254 Ga. App. 450, 454 (562 SE2d 515) (2002). Nonetheless, we note that probable cause that existed to arrest the appellants renders this claim moot.

[9] *McNeely*, supra.

## Case No. A05A1837

The trial court granted summary judgment to LGC, Evans, and Blackburn (collectively referred to herein as the "LGC Defendants") on plaintiffs' claims for negligence, false imprisonment, false arrest, malicious prosecution, slander, intentional infliction of emotional distress, tortious misconduct, conversion, and punitive damages. We reverse as to all claims except negligence, slander, tortious misconduct, and conversion.

3. Appellants argue that summary judgment is inappropriate on their claims for negligence, false imprisonment, false arrest, and malicious prosecution because there is evidence in the record that creates a genuine issue of material fact, specifically, the impact of Evans's exhortations on the officers' decision to make an arrest. We note, at the outset, that appellants present no evidence that Blackburn did or said anything to directly or indirectly urge the officers to prosecute the appellants. Therefore, the trial court appropriately granted summary judgment to Blackburn on appellants' claims. However, with regard to Evans, and by virtue of vicarious liability, LGC, we agree with appellants that summary judgment was inappropriate on these claims.

(a) "Although similar, the elements that must be proved for false arrest, malicious prosecution, and false imprisonment, and the circumstances which give rise to each, vary to some degree."[10] "In each case, the law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute."[11] "In the former case there is potential liability . . . ; in the latter case there is not. It is clear, though, that initiation of the criminal action need not be expressly directed by the party to be held liable."[12]

In this case, the trial court concluded that the officers' decision to arrest was based on their independent investigation. In support of its conclusion, the trial court pointed to the officers' sworn testimony that their decisions to arrest were made independently.[13] In *Jacobs v.*

---

[10] (Citations omitted.) *Jacobs v. Shaw*, 219 Ga. App. 425, 426 (1) (465 SE2d 460) (1995). See OCGA §§ 51-7-1; 51-7-40; 51-7-20.

[11] (Citation and punctuation omitted.) *Jacobs*, supra. Accord *Wolf Camera v. Royter*, 253 Ga. App. 254, 257-258 (1) (a) (558 SE2d 797) (2002) ("A distinction must be taken between actually instigating or procuring the institution of criminal proceedings and merely laying information before a law enforcement official without in any way attempting to influence his judgment.").

[12] *Wolf Camera*, supra.

[13] Both officers deposed that their decisions to arrest for forgery were independent.

*Shaw*,[14] we held that these causes of action "may successfully be defended by an *uncontroverted* affidavit of the arresting officer that the decision to arrest plaintiff was made solely by him in the exercise of his professional judgment and independently of any exhortations by the defendants."[15] However, this case is distinguishable on two fronts. First, the arresting officers in this case are parties to the case, not disinterested witnesses. Therefore, their deposition testimony that the arrest was based solely upon their professional judgment constitutes a mere statement of self-serving opinion and a legal conclusion that cannot support the grant of summary judgment.[16] "[W]e must give full weight to the rule that a jury, not a judge, may construe the facts upon which such opinion is based and reach a diametrically different conclusion to that reached by the witness. . . . Thus, on opinion evidence alone, a summary judgment is not demanded as a matter of law."[17]

Second, even if the officers were not parties, their sworn testimony here is controverted by conversations among the parties during the investigation at the scene of the incident, which were captured on the videotape. At one point during the videotape, Evans calls Grayson over to where she's talking to Johns and the following conversation ensues:

CORPORAL JOHNS: [S]ee it's offset on the printing and everything.
MS. EVANS: Uh-huh.
CORPORAL JOHNS: Tell Mike — Mike, let me see your wad of money, Mike.
MS. EVANS: Look at the dates on them. All right. These are —

CORPORAL JOHNS: Give me any bills, just any two or three bills, just don't — separate which ones are which.
MS. EVANS: All right. These are the ones she gave me.
CORPORAL JOHNS: Okay. Yeah, they're all identical, every one of them you gave me.
MS. EVANS: Right. How many twenty-dollar bills will you

---

[14] Supra.
[15] (Emphasis supplied.) Id.
[16] *Johnson v. MARTA*, 230 Ga. App. 105, 107 (1) (495 SE2d 583) (1998) ("Allegations, conclusory facts, and conclusions of law cannot be utilized to support or defeat motions for summary judgment.") (citation omitted).
[17] (Citations and emphasis omitted.) *Ginn v. Morgan*, 225 Ga. 192, 193 (167 SE2d 393) (1969). Accord *Corporate Property Investors v. Milon*, 249 Ga. App. 699, 701-702 (1) (a) (549 SE2d 157) (2001) (statement of police officer defendant that the arrest was based on her professional judgment was conclusory and could not support the grant of summary judgment) (physical precedent only).

find with the 1950 dates on them?

CORPORAL JOHNS: Well, see, she said he's been saving them but — okay.

MS. EVANS: Damn, Chase . . .

CORPORAL JOHNS: Well, I'm just trying to make sure I got all my ducks in a row.

MS. EVANS: Well, I understand that.

A jury could conclude from this exchange that Evans's comments went beyond merely relaying the facts to the officers and that her intent was to challenge or question any inclination that Johns may have had to believe Elliott's explanation as to how she came to be in possession of the bills. Accordingly, we agree with appellants that this evidence creates a genuine issue of fact as to Evans, and consequently LGC's, liability for false arrest, false imprisonment, and malicious prosecution.[18]

In his dissent, Judge Andrews concludes that the same probable cause for the arrest and prosecution that entitled the police officer defendants to summary judgment on the claims for false arrest, false imprisonment, and malicious prosecution, also entitles Evans and LGC as well as Grayson and CPG (appellees in Case No. A05A1838) to summary judgment on those claims. We disagree.[19]

For the purpose of assessing probable cause, Evans and Grayson's involvement in the arrest of the plaintiffs can be analogized to a citizen's arrest. At common law, when a felony actually had been committed, a private person was authorized to arrest the person whom he reasonably believed committed the felony, and could arrest for a misdemeanor if it was committed in his presence and involved a breach of the peace.[20] Nonetheless, the private person's authority to arrest was more limited than an officer's.[21] "If called upon to justify his act, some courts [found] that [the private person] must show that the felony had actually been committed, and that he had reasonable grounds for believing the person arrested to be guilty; while other

---

[18] Compare *Taylor v. Super Discount Market*, 212 Ga. App. 155, 157 (2) (441 SE2d 433) (1994) (summary judgment appropriate on false imprisonment claim where employee handed suspected counterfeit bill to officer and asked him to judge its validity).

[19] For purposes of efficiency, we address herein Judge Andrews's position regarding the liability of Grayson and CPG, in addition to Evans and LGC, even though the former defendants' liability is discussed fully below in Case No. A05A1838.

[20] *Moll v. United States*, 413 F2d 1233, 1236 (I) (5th Cir. 1969). See also *Long v. State*, 12 Ga. 293 (4) (1852) ("It [was not only the right but] the duty of a private person, who [was] present when a felony [was] committed, to apprehend the felon . . . ; and, after a felony [was] committed, any private person [could] arrest the felon with the same view, upon reasonable and probable ground of suspicion of his guilt."). Whether reasonable and probable grounds for suspicion existed was for the determination of the jury. Id.

[21] *Graham v. State*, 143 Ga. 440, 444 (3) (85 SE 328) (1915).

courts have gone further, and held that he must show that the person arrested was actually guilty."[22] In other words, the private citizen who made an arrest was strictly liable for the arrestee's damages if the arrestee was innocent.[23] Therefore, the distinction between the privileges afforded a police officer as opposed to a citizen in this regard pertained to the personal liability in the event of a false arrest.[24] The officer could not be sued personally if it were later determined, as in this case, that there had been in actuality no probable cause.

In view of the wide divergence between the two special concurrences, we leave it to the commentators to decide whether Georgia law has approached, or should approach, probable cause differently when analyzing whether an officer had probable cause to interfere with a subject's liberty, or whether a citizen had the right to remain secure in his home and papers, or whether an officer should be sued after making a good faith arrest based on apparent probable cause, or whether one citizen can vindicate his rights against another citizen after an unjust arrest. In any event, based on Georgia case law, it is for a jury to decide in the present instance whether Evans, LGC, Grayson, and CPG may be liable.[25]

(b) Appellants argue that the trial court erred in granting summary judgment to the LGC defendants on their negligence claim because "factual disputes remain regarding probable cause." As discussed in Case No. A05A1836, we find no error in the trial court's

---

[22] Id. OCGA § 17-4-60 codifies Georgia's law on arrests made by private citizens. It provides that "[a] private person may arrest an offender if the offense is committed in his presence or within his immediate knowledge. If the offense is a felony and the offender is escaping or attempting to escape, a private person may arrest him upon reasonable and probable grounds of suspicion."

[23] See also *McWilliams v. Interstate Bakeries*, 439 F2d 16 (5th Cir. 1971) (case remanded to jury to determine damages against private citizen who detained the plaintiff because he had exposed himself to her four days earlier because law provided that arrest must occur immediately after the commission of the offense).

[24] *Graham*, supra at 445 (3) ("[s]tatutes allowing arrests by private individuals, when not called upon by proper authority to act, should be strictly, rather than liberally, construed, as in derogation of the common law protecting the liberty of the citizen").

[25] *Simmons v. Mableton Finance Co.*, 254 Ga. App. 363, 366 (4) (562 SE2d 794) (2002) (genuine issue of material fact existed as to whether company and employee instigated prosecution of customer); *McClelland v. Courson's 441 South Station*, 248 Ga. App. 170 (546 SE2d 300) (2001) (genuine issue of material fact existed in malicious prosecution claim where store employee failed to adequately investigate information that led store to submit affidavit identifying arrestee as the perpetrator); *Fleming v. U-Haul Co. of Ga.*, 246 Ga. App. 681, 682-683 (2) (541 SE2d 75) (2000) (where company negligently failed to ascertain the complete state of facts or recklessly failed to present them fully and fairly, summary judgment on claims for false arrest and malicious prosecution was precluded); *Wilson v. Wheeler's, Inc.*, 190 Ga. App. 250 (378 SE2d 498) (1989) (genuine issues of material fact existed as to whether probable cause existed for customer's arrest where slight diligence exercised on the part of the store would have shown that there could be no conviction).

conclusion that at the time the prosecution was instituted, the facts could have led a reasonable person to believe that probable cause existed to arrest the appellants for passing counterfeit bills. This finding applies to the LGC defendants as well. Thus, this argument fails.

Appellants also argue that their negligence claim should have survived summary judgment because the LGC defendants failed to abide by their promise to verify the authenticity of the bills at the bank on the next business day. But appellants have not established that the LGC defendants had a duty to do so. "In the analysis of a negligence action, the plaintiff must show a duty, a breach of that duty, causation, and damages."[26] As appellants have failed to establish any of these elements, the trial court properly granted summary judgment on their negligence claim.

4. Appellants argue that the trial court erroneously concluded that Evans's and Blackburn's statements were not slanderous and were nonetheless privileged because they were made in good faith in compliance with a law enforcement investigation. We find no error.

Pursuant to OCGA § 51-5-4, a person slanders another when he imputes to him a crime punishable by law; charges him with having some contagious disorder or with being guilty of some debasing act which may exclude him from society; makes charges against the person in reference to his trade, office, or profession, calculated to injure the person in those areas; or utters any disparaging words productive of special damage which flows naturally from the statement. In order to recover for slander, however, appellants must also show the publication of the alleged statement to another,[27] which appellants in the case sub judice fail to establish.

Appellants argue that Evans told Elliott that the bills were counterfeit in the presence of other individuals in the store, but Elliott's own testimony belies this argument. Elliott deposed that Evans marked the bills and then repeatedly yelled for the manager, but that Evans did not yell that the money was counterfeit; that after Blackburn appeared, Evans continued to talk loudly but that Elliott did not know what Evans said; and that Blackburn handled the situation in a courteous manner. Appellants presented no evidence that the LGC defendants actually accused them of committing a crime. Therefore, pretermitting whether there was a publication of the statements, we agree with the trial court's conclusion that the statements made in the store were not slanderous.

---

[26] (Punctuation and footnote omitted.) *Alexander v. A. Atlanta Autosave*, 272 Ga. App. 73, 76 (2) (611 SE2d 754) (2005).

[27] *Fly v. Kroger Co.*, 209 Ga. App. 75, 77 (1) (432 SE2d 664) (1993).

Regarding the statements made to initiate the prosecution of appellants, we have held that

> statements made in good faith pursuant to investigation by police or other officers authorized to investigate crime or criminal activity are made in the performance of a public duty and are privileged. OCGA § 51-5-7 (1). If such were not the case these officers would find it virtually impossible to ferret out the facts and prosecute those who have violated the criminal laws. It is difficult at best, but the law does not put roadblocks before those who may have information and prevent the communication of it to the officers. Indeed, it is made the duty of one having such information to report it to those in authority.[28]

"To make the defense of privilege complete, in an action of slander or libel, good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons must all appear."[29] Based on the record, we find no error in the trial court's conclusion that the statements made, even if slanderous, were privileged.[30]

5. The trial court also granted summary judgment on appellants' tortious misconduct claim.

> Tortious misconduct is based upon the principle that one who owns a mercantile establishment and sells goods owes a duty to a customer who is lawfully in his store by his implied invitation for the purpose of transacting business, to protect the customer against the use of any unprovoked and unjustifiable opprobrious and insulting and abusive words by a clerk employed by him to deal with customers, tending to humiliate, mortify, and wound the feelings of the customer.[31]

In light of the testimony discussed in Division 4 as to Elliott's conversations with Evans and Blackburn as well as the complete lack

---

[28] (Citation and punctuation omitted.) Id. at 78 (2). See also *Dominy v. Shumpert*, 235 Ga. App. 500, 504 (2) (510 SE2d 81) (1998); OCGA § 51-5-7 (1), (2).

[29] (Citation omitted.) *Dominy*, supra.

[30] Had we concluded that the employees' statements were slanderous, LGC would not be vicariously liable therefor because "a corporation is not liable for the slanderous utterances of an agent acting within the scope of his employment, unless it affirmatively appears that the agent was expressly directed or authorized to slander the plaintiff." (Citation and punctuation omitted.) *Smith v. Trust Co. Bank*, 215 Ga. App. 413, 416 (2) (450 SE2d 866) (1994).

[31] (Citation and footnote omitted.) *Wolter v. Wal-Mart Stores*, 253 Ga. App. 524, 526-527 (559 SE2d 483) (2002).

of evidence as to comments either Blackburn or Evans made to Adams, we find no error in the trial court's decision to grant summary judgment to the LGC defendants on the appellants' tortious misconduct claim.[32]

6. Appellants do not enumerate as error the trial court's ruling that defendants are entitled to summary judgment as a matter of law on plaintiffs' claims for conversion, intentional infliction of emotional distress, and punitive damages. Therefore, the trial court's rulings thereon stand.

*In sum, we affirm the grant of summary judgment as to appellee Blackburn on all of plaintiffs' claims. As to appellees Evans and LGC, we affirm the grant of summary judgment on plaintiffs' claim of intentional infliction of emotional distress, slander, tortious misconduct, negligence, conversion, and punitive damages, but reverse as to the claims for false arrest, false imprisonment, and malicious prosecution.*

## Case No. A05A1838

The trial court granted summary judgment to CPG, Wallace, and Grayson (collectively referred to herein as the "CPG defendants") on appellants' claims for negligence, false imprisonment, false arrest, malicious prosecution, intentional infliction of emotional distress, and punitive damages. Appellants abandoned their slander claim against these defendants at oral argument on the motion for summary judgment.

7. Relying on *Melton v. LaCalamito*,[33] a malicious prosecution and false imprisonment case, appellants argue that the CPG defendants are civilly liable to them because Grayson told Evans to call the police without investigating the incident. *Melton*, however, does not support the appellants' position. There, the defendant, an owner and operator of a U-Haul Company, contacted the police after accusing the plaintiff of illegally possessing U-Haul furniture pads. After the defendant engaged in a 30 to 40-minute discussion with the police wherein he insisted on the surrender of the pads, the police arrested the plaintiff.[34] The case was tried and the jury found in favor of the

---

[32] See *Mitchell v. Lowe's Home Centers*, 234 Ga. App. 339, 343 (3) (506 SE2d 381) (1998) (although store employees could have been more tactful in handling situation involving allegation of shoplifting, their conduct did not rise to the level of tortious misconduct). But see *Simmons v. Kroger Co.*, 218 Ga. App. 721, 724 (2) (463 SE2d 159) (1995) (summary judgment on tortious misconduct precluded where customer was detained, threatened with arrest if he resisted, grabbed by the arm, and escorted to security office).

[33] 158 Ga. App. 820 (282 SE2d 393) (1981).

[34] Id. at 822-823 (2) (a).

plaintiff.[35] Affirming the trial court's denial of the defendant's motion for directed verdict on the plaintiff's malicious prosecution claim, we found that "the jury was authorized to conclude that [the defendant's] insistence that the pads were U-Haul property was the determining factor leading to appellee's arrest and prosecution,"[36] not the fact that the defendant called the police.

Although Grayson's instruction to Evans to call the police does not render the CPG defendants liable to appellants, Grayson's subsequent conduct constitutes evidence from which a jury could conclude that Grayson, and consequently, CPG, are liable for malicious prosecution, false arrest and false imprisonment. The following colloquy occurred at the scene after Johns attempted to explain to Elliott that he needed to investigate the matter.

> GRAYSON: Chase?
> CORPORAL JOHNS: Yeah, yeah.
> GRAYSON: She took the three bills and marked — she took two bills and marked them. She said I can't accept these, they're coming up as counterfeit. . . . She said, I can't give you these bills because they're — and she just walked away. Now that's kind of suspicious. I don't think if I gave somebody 60 bucks in cash I'd just walk out without saying there's a problem.
> CORPORAL JOHNS: Yeah.
> GRAYSON: I didn't realize — I don't know if she told you that. That's something I just heard and that sounds awfully odd to me.

The evidence of record does not comport with Grayson's statement that Elliott gave Evans $60, then made the statement that Grayson attributed to her and exited the store. Instead, the record shows that Grayson was called to the scene after the women left the store and that Evans told him that the women passed counterfeit bills and pointed them out to him. Additionally, both Evans and Blackburn deposed that after the exchange of the bills, Elliott gave them her name and address, as opposed to immediately fleeing the store, as arguably insinuated by Grayson. Also evidenced on the videotape are statements made by Grayson in which he points out factors that he believed were relevant in the determination of whether the money was counterfeit.

---

[35] Id. at 820.
[36] (Citations omitted.) Id. at 823 (2) (a).

As stated earlier, in cases involving false arrest, malicious prosecution, and false imprisonment, the law draws a fine distinction between occasions wherein a party directly or indirectly urges law enforcement officials to begin criminal proceedings, which result in potential liability, and incidents wherein a party merely relays facts to an official who then makes an independent decision to arrest, which does not result in liability.[37] Based on Grayson's conversations with Johns during Johns's investigation, the jury could conclude that Grayson communicated facts to Johns which were false or misleading, with the intent to influence Johns to prosecute.[38] Accordingly, the trial court's grant of summary judgment to CPG and Grayson is reversed. As appellants have presented no evidence from which a jury could determine that Wallace directly or indirectly urged their arrest, the trial court's grant of summary judgment to Wallace on these claims is affirmed.

8. Appellants argue that Grayson's conduct of interjecting himself into the investigation constituted a wanton and reckless disregard for appellants' rights, which precludes the entry of summary judgment on their claims for intentional infliction of emotional distress and punitive damages. "To recover for intentional infliction of emotional distress, the [appellants] were required to prove the following elements: (1) intentional or reckless conduct, (2) which is extreme and outrageous, (3) and caused the emotional distress, (4) which is severe."[39] In our view, a rational and impartial jury could conclude that Grayson relayed misleading or false information to the investigating officer, which constituted reckless conduct of an extreme and outrageous nature and consequently caused Adams and Elliott severe emotional distress. Therefore, we reverse the grant of summary judgment to CPG and Grayson on this claim. Consequently,

[37] *Jacobs*, supra; *Wolf Camera*, supra. Accord *Vojnovic v. Brants*, 272 Ga. App. 475, 478 (2) (b) (612 SE2d 621) (2005).

[38] See *Willis v. Brassell*, 220 Ga. App. 348, 351 (1) (a) (469 SE2d 733) (1996) (malicious prosecution claim was properly considered by jury where there was evidence that tended to prove that accuser relayed to police information which he knew to be false, misleading or materially incomplete, from which the jury reasonably could conclude that the accuser was attempting to influence the police to prosecute); *Kaiser v. Tara Ford*, 248 Ga. App. 481, 487 (1) (a) (546 SE2d 861) (2001) ("A person may be held liable for unduly influencing the decision to prosecute by providing information that is known to be false, misleading or materially incomplete.") (citations omitted); *Wolf Camera*, supra at 258 (1) (a) ("A person may be liable where he gave information to the investigating officer which he knew to be false and so unduly influenced the authorities.") (citation and footnote omitted). See also *Gen. Finance Corp. of Ga. v. King*, 163 Ga. App. 717-718 (294 SE2d 694) (1982) (genuine issue of fact remained as to whether corporation instigated criminal proceedings).

[39] (Citation omitted.) *State Soil & Water Conservation Comm. v. Stricklett*, 252 Ga. App. 430, 437 (4) (a) (555 SE2d 800) (2001).

we also reverse the grant of summary judgment to CPG and Grayson on the appellants' punitive damages claim.

> In an action for malicious prosecution the plaintiff is not restricted to actual damages but may recover such damages as are authorized under all the circumstances in the case. A jury may award additional damages in a tort action where there are aggravating circumstances, either in the act or the intention. To authorize the imposition of . . . punitive damages . . . [,] there must be evidence of wilful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of a conscious indifference to consequences.[40]

The same evidence from which a jury could conclude that Grayson's conduct was extreme and outrageous could cause it to infer that he acted maliciously and with a conscious disregard of the consequences the appellants might suffer.

9. Lastly, appellants maintain that the trial court should not have granted summary judgment on their claim for negligence against the CPG defendants. We disagree.

As stated earlier, to sustain a negligence action, "the plaintiff must show a duty, a breach of that duty, causation, and damages."[41] Appellants argue that the CPG defendants had a duty to ensure that their patrons were not injured in the course of their lawful business activities and that the CPG defendants breached this duty when they allowed erroneous or inaccurate accusations of criminal activity to injure its patrons. In essence, appellants are indirectly arguing that the CPG defendants are liable in negligence because appellants were arrested. As stated earlier, we find no error in the institution of the criminal proceeding against the appellants. Accordingly, this error fails as well.

In sum, in Case No. A05A1836, we affirm the grant of summary judgment to Carlisle, Johns, and Miller on all of plaintiffs' claims. In Case No. A05A1837, we affirm the grant of summary judgment to Blackburn on all of plaintiffs' claims and reverse as to LGC and Evans only on plaintiffs' claims of malicious prosecution, false arrest, and false imprisonment. Finally, in Case No. A05A1838, we affirm the grant of summary judgment to Wallace on all of plaintiffs' claims but reverse as to CPG and Grayson only on plaintiffs' claims of malicious

---

[40] (Citations and punctuation omitted.) *Melton*, supra at 825 (2) (d).
[41] *Alexander*, supra.

prosecution, false arrest, false imprisonment, intentional infliction of emotional distress, and punitive damages.

In conclusion, we affirm the grant of summary judgment as to appellee Wallace on all of plaintiffs' claims. As to appellees Grayson and CPG, we affirm the grant of summary judgment on plaintiffs' claim of negligence but reverse as to the claims of false arrest, false imprisonment, and malicious prosecution, intentional infliction of emotional distress, and punitive damages.

*Judgment affirmed in Case No. A05A1836. Andrews, P. J., Johnson, P. J., and Blackburn, P. J., concur. Ruffin, C. J., Barnes and Phipps, JJ., concur in the judgment only.*

*Judgment affirmed in Case No. A05A1837 as to appellee Blackburn on plaintiffs' claims of false imprisonment, false arrest, malicious prosecution, slander, tortious misconduct, conversion, negligence, intentional infliction of emotional distress, and punitive damages. Andrews, P. J., Johnson, P. J., and Blackburn, P. J., concur. Ruffin, C. J., Barnes and Phipps, JJ., dissent on plaintiffs' negligence claim and concur in the judgment only as to the remaining claims. Judgment reversed as to appellees Evans and LGC on plaintiffs' claims of false imprisonment, false arrest, and malicious prosecution. Ruffin, C. J., Barnes and Phipps, JJ., concur in the judgment only. Andrews, P. J., Johnson, P. J., and Blackburn, P. J., dissent. Judgment affirmed as to appellees Evans and LGC as to plaintiffs' claims of slander and tortious misconduct. Andrews, P. J., Johnson, P. J., and Blackburn, P. J., concur. Ruffin, C. J., Barnes and Phipps, JJ., concur in the judgment only. Judgment affirmed as to appellees Evans and LGC as to plaintiffs' claims of conversion, intentional infliction of emotional distress, and punitive damages. Ruffin, C. J., Andrews, P. J., Johnson, P. J., Blackburn, P. J., Barnes and Phipps, JJ., concur.*

*Judgment affirmed in Case No. A05A1838 as to appellee Wallace on plaintiffs' claims of false imprisonment, false arrest, malicious prosecution, intentional infliction of emotional distress, and punitive damages. Ruffin, C. J., Andrews, P. J., Johnson, P. J., Blackburn, P. J., Barnes and Phipps, JJ., concur. Judgment affirmed as to appellee Wallace on plaintiffs' claim of negligence. Andrews, P. J., Johnson, P. J., and Blackburn, P. J., concur. Ruffin, C. J., Barnes and Phipps, JJ., concur in the judgment only. Judgment reversed as to appellees Grayson and CPG on plaintiffs' claims of false imprisonment, false arrest, malicious prosecution, intentional infliction of emotional distress, and punitive damages. Ruffin, C. J., Barnes and Phipps, JJ., concur. Andrews, P. J., Johnson, P. J., and Blackburn, P. J., dissent. Judgment affirmed as to appellees Grayson and CPG as to plaintiffs' claim of negligence. Andrews, P. J., Johnson, P. J., and Blackburn, P. J., concur. Ruffin, C. J., Barnes and Phipps, JJ., concur in the judgment only.*

ANDREWS, Presiding Judge, concurring in part and dissenting in part.

I concur in the portion of the majority opinion affirming the trial court's grant of summary judgment in Case Nos. A05A1836, A05A1837, and A05A1838. I respectfully dissent from the majority opinion to the extent it reverses the trial court's grant of summary judgment to defendants in Case Nos. A05A1837 and A05A1838.

In Case No. A05A1836, the majority affirmed the trial court's grant of summary judgment on all claims (including false arrest, false imprisonment, and malicious prosecution) in favor of all the police officer defendants (Corporal Johns, Investigator Miller, and Sheriff Carlisle). In doing so, the majority correctly rejected the claim made by Adams and Elliott that they were arrested and prosecuted without probable cause. The majority rejected this claim as a matter of law holding that the officers made the warrantless arrests on the basis of undisputed material facts appearing at the time of the arrests which created "a *reasonable belief* that there was probable cause for the arrest and prosecution." (Footnote omitted; emphasis in original.) *McNeely v. Home Depot*, 275 Ga. App. 480, 482 (621 SE2d 473) (2005). The officers used their training in the detection of counterfeit bills to observe that a counterfeit pen made suspicious looking color marks on the bills; that the layout of the bills was not properly centered; and that the bills did not feel right and had a strange watermark and a funny color. As the majority points out, evidence that the counterfeit pen did not work on older bills was not sufficient to show there was a lack of probable cause. In addition to the above undisputed facts observed by the arresting officers, probable cause for the arrests was based on the undisputed fact that the officers were aware that counterfeit bills were frequently being passed at the mall where Adams and Elliott were shopping. As the majority notes, Officer Miller also had a lawful basis to arrest and detain Adams for violation of OCGA § 16-13-75 when the officer obtained Adams' consent to search her purse and he found prescription drugs not contained in their original container. On that charge, the officer's personal observation of the facts provided probable cause for the arrest.

The same probable cause for the arrest and prosecution that entitled the police officer defendants to summary judgment on the claims for false arrest, false imprisonment, and malicious prosecution, also entitles Glenda K. Evans and her employer, Le Gourmet Chef (LGC) (Case No. A05A1837), and Michael G. Grayson and his employer, CPG Partners, L.P., d/b/a North Georgia Premium Outlet Mall (CPG) (Case No. A05A1838), to summary judgment on those claims. Proof that there was a lack of probable cause to support the criminal proceedings was an element that Adams and Elliott were required to prove on all of these claims. Whether a false arrest claim

is based on an arrest under process of law or, as in the present case, a warrantless arrest, lack of probable cause for the arrest is an element of the claim. *Gantt v. Patient Communications Systems*, 200 Ga. App. 35, 38 (406 SE2d 796) (1991); *Mohamud v. Wachovia Corp.*, 260 Ga. App. 612 (580 SE2d 259) (2003). Similarly, false imprisonment and malicious prosecution claims include the elements of unlawful detention and prosecution without probable cause. *Fleming v. U-Haul Co. &c.*, 246 Ga. App. 681, 682-683 (541 SE2d 75) (2000); *McNeely*, 275 Ga. App. at 482; *Mitchell v. Lowe's Home Centers*, 234 Ga. App. 339, 340-341 (506 SE2d 381) (1998) (defense of warrantless arrest in false imprisonment case must show an arrest based on probable cause and made pursuant to the appropriate exigent circumstances).[42]

In support of their claims for false arrest, false imprisonment, and malicious prosecution, Adams and Elliott alleged that Evans and Grayson (and LGC and CPG based on the principle of respondeat superior) instigated or procured the criminal proceedings by making statements to the police officers about the bills which provided the officers with a false basis to arrest, detain, and prosecute. The record shows, however, that material facts directly observed by the arresting officers (what the bills looked like to them) and otherwise known to the officers (that counterfeit bills had been frequently passed at the mall) provided a probable cause basis for the officers to arrest, detain, and prosecute. Accordingly, this is a case where facts seen by and known to the officers — independent of anything told to them by Evans or Grayson — provided the necessary probable cause. Even if, as the majority finds, Evans urged Corporal Johns not to believe Elliott's explanation as to how she got the bills, and Grayson gave misleading information to Johns insinuating that Elliott may have attempted to flee the store after passing the bills, the officers had probable cause independent of these statements.

Furthermore, the arresting officers gave uncontradicted deposition testimony that they acted on this independent basis for probable cause when they made the decision to arrest, detain, and prosecute. The majority disregards this testimony as self-serving opinion. Although opinion testimony alone is not sufficient to support the award of summary judgment in a nonexpert opinion case, the reason for this rule is that opinion testimony cannot resolve questions of fact reserved for the jury. *Ginn v. Morgan*, 225 Ga. 192, 193-194 (167 SE2d 393) (1969). But whether or not probable cause existed is not a

---

[42] In the present case, the record not only shows probable cause, but also that the officers made the warrantless arrests pursuant to the exigent circumstances set forth in OCGA § 17-4-20 (a).

question of fact for the jury in the present case. As the majority correctly holds as a matter of law, undisputed material facts in the record established that the officers had probable cause. Moreover, these facts were directly observed by or known to the officers independent of any statements made to them by Evans or Grayson. It is not a matter of opinion but a statement of fact by the officers that they relied on these independently obtained facts as the basis for their decision to arrest, detain, and prosecute. The testimony by the officers that they relied on facts independently obtained by them cannot be disregarded as self-serving or conclusory merely because the officers were parties to the case. The testimony was supported by substantiating fact and circumstances, so it was neither self-serving nor conclusory. *Keene v. Herstam*, 225 Ga. App. 115, 117 (483 SE2d 335) (1997). Even if the officers also considered statements made to them by Evans and Grayson, the record clearly shows that facts obtained by the officers independent of those statements provided probable cause for the officers' decision to arrest, detain, and prosecute Adams and Elliott. *Jacobs v. Shaw*, 219 Ga. App. 425, 426-427 (465 SE2d 460) (1995).

In response to the motion for summary judgment, Adams and Elliott were required to show that a factual issue existed as to whether Evans or Grayson instigated or procured the criminal proceedings by knowingly giving the officers false, misleading, or materially incomplete facts which were the determining factor or an undue influence in the officers' decision to arrest, detain, and prosecute. *Willis v. Brassell*, 220 Ga. App. 348, 350-353 (469 SE2d 733) (1996); *Ginn v. C & S Nat. Bank*, 145 Ga. App. 175, 178 (243 SE2d 528) (1978); *Melton v. LaCalamito*, 158 Ga. App. 820, 822-823 (282 SE2d 393) (1981). Because the record shows as a matter of law that facts independently obtained by the officers provided probable cause for the officers' decision to arrest, detain, and prosecute, there is an absence of any causal link between the officers' decision and statements made by Evans and Grayson. *McLeod v. Pruco Life Ins. Co.*, 215 Ga. App. 177, 179-180 (449 SE2d 895) (1994). Accordingly, there is an absence of any evidence in the record supporting the claims by Adams and Elliott that they were falsely arrested, falsely imprisoned, and maliciously prosecuted because of any false, misleading, or materially incomplete statements made by Evans and Grayson. *Jacobs*, 219 Ga. App. at 426-427. It follows that Evans and her employer, LGC (Case No. A05A1837), and Grayson and his employer, CPG (Case No. A05A1838), were entitled to summary judgment on the claims for false arrest, false imprisonment, and malicious prosecution. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

I also dissent in Case No. A05A1838 from the majority's reversal of the trial court's grant of summary judgment to Grayson and CPG on the claims for intentional infliction of emotional distress and punitive damages.

When Adams and Elliott appealed in Case No. A05A1838 from the grant of summary judgment to Grayson and CPG on all claims and submitted their appellants' brief on July 20, 2005, they did not enumerate as error and did not address the fact that the trial court granted summary judgment against them on their claims for intentional infliction of emotional distress and punitive damages. Accordingly, the appellees' brief filed in response on August 9, 2005, did not address these issues and noted that Adams and Elliott did not appeal from the trial court's grant of summary judgment on these issues. On August 10, 2005, Adams and Elliott refiled their appellants' brief in response to a motion requiring that it conform to Court of Appeals Rules. In their refiled brief, Adams and Elliott raise these issues on appeal in a single sentence buried in their argument that the trial court erroneously concluded there was probable cause for the criminal proceedings. Adams and Elliott then filed an appellants' reply brief on August 20, 2005, arguing that they had not failed to appeal from the award of summary judgment on their claims for intentional infliction of emotional distress and punitive damages because "a finding by this court that Appellees lacked probable cause creates a jury issue as to these additional issues." Because Adams and Elliott failed to timely raise these issues in their enumerations of error, and this failure cannot be cured by attempting to raise the issues in a refiled or supplemental brief, this Court has no jurisdiction to address the issues. *Coweta County v. Simmons*, 269 Ga. 694-695 (507 SE2d 440) (1998); *In re Harvey*, 219 Ga. App. 76, 79-80 (464 SE2d 34) (1995). The trial court's award of summary judgment to Grayson and CPG on the claims for intentional infliction of emotional distress and punitive damages should be affirmed.

I am authorized to state that Presiding Judge Johnson and Presiding Judge Blackburn join in this opinion.

PHIPPS, Judge, in Case No. A05A1836, concurring in the judgment only; in Case No. A05A1837, concurring in the judgment only in Divisions 3 (a), 4, and 5, dissenting in Division 3 (b), and concurring fully in Division 6; in Case No. A05A1838, concurring fully in Divisions 7 and 8 and concurring in the judgment only in Division 9.

In Case No. A05A1836, I concur in the judgment only. The record shows a lack of probable cause for the arrests of Adams and Elliott. But the appellants have failed to show any waiver of sovereign or official immunity. For this reason, the grant of summary judgment to

Johns, Miller, and Carlisle on the claims of malicious prosecution, false arrest, and false imprisonment was proper.

In Case No. A05A1837, I concur in the judgment only with respect to that part of the judgment reversing the grant of summary judgment to Evans and LGC on the issues of false imprisonment, false arrest, and malicious prosecution; affirming the grant of summary judgment to Blackburn on these claims; and affirming summary judgment to the LGC Defendants on the issues of slander and tortious misconduct. I respectfully dissent from that part of the judgment affirming the grant of summary judgment to the LGC Defendants on the claims of negligence. And I concur fully in that part of the judgment determining that the grant of summary judgment on the issues of conversion, intentional infliction of emotional distress, and punitive damages stands as uncontested.

Finally, in Case No. A05A1838, I concur fully in that part of the judgment reversing the grant of summary judgment to CPG and Grayson on the issues of false imprisonment, false arrest, malicious prosecution, intentional infliction of emotional distress, and punitive damages and in that part of the judgment affirming the grant of summary judgment to Wallace on these issues. With respect to that part of the judgment affirming the grant of summary judgment to the CPG Defendants on the claims of negligence, I concur in the judgment only.

## Case No. A05A1836

1. "Probable cause exists where the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."[43] Where a reasonable person would investigate further before beginning a prosecution, the failure to do so may show a lack of probable cause.[44]

> The defendant is not necessarily required to verify his information, where it appears to be reliable; but where a reasonable man would investigate further before beginning the prosecution he may be liable for failure to do so. All such factors as the reliability of the source, the availability of further information and the difficulty of obtaining it, the reputation of the accused, and his opportunity to offer an explanation, and the apparent necessity of prompt action,

---

[43] *Means v. City of Atlanta Police Dept.*, 262 Ga. App. 700, 706 (586 SE2d 373) (2003) (citations and punctuation omitted).

[44] See *Melton v. LaCalamito*, 158 Ga. App. 820, 824 (2) (b) (282 SE2d 393) (1981).

are to be considered in determining whether it was reasonable to act without verification.[45]

Applying the foregoing, the evidence shows a lack of probable cause to support the arrests of Adams and Elliott for forgery.

The video shows the significant reliance that Johns and Miller placed upon the results of the pen tests that failed to indicate that Adams's and Elliott's bills were authentic.[46] Blackburn, the store manager, identified at his deposition a counterfeit detection pen, which he testified was like the one used by the store. The pen he identified pertinently instructed, "Use in addition to standard detection methods. Effective on most U. S. currency series 1959 and after." Evans recalled in her deposition that the pen itself and/or the pen's package instructed that the pen was not to be used to determine whether bills "older than 1959" were authentic. At the scene that day, she handed Johns both the pen she had used to test Elliott's old bills and a new package containing a counterfeit detection pen. She also pointed out to Johns that Elliott's bills had "1950 dates on them."

Despite evidence that the pen itself and the pen's package contained plain disclaimers and evidence that Johns had both the pen and a pen package, the majority labels as a "fact" that "neither Johns nor Miller knew that the drimark pens did not work on bills older than 1959." Moreover, the majority finds that this "fact" is not particularly pertinent because a savvy counterfeiter might use the pen's technological limitations to his or her advantage.

The pen's limitations and the series of the bills were readily available to Johns. And whether an officer investigates the evidence at hand before beginning a prosecution is certainly pertinent to a determination of probable cause.[47] Because the pen was incapable of authenticating the old bills at issue here, the results of the pen tests of the bills were not "reasonably trustworthy information . . . sufficient in themselves to warrant a man of reasonable caution" to believe that forgery was afoot.[48] Notwithstanding that a counterfeiter might use the pen's technological limitations to his or her advantage, the results of the pen tests should have played no part in the law enforcement officers' investigation of Elliott's bills because the bills simply fell outside the testing range of the pen. No probable cause stemmed from the useless results of the pen tests.

---

[45] Id. (citation and punctuation omitted).

[46] As to Adams, the video shows that after Johns tested her money with a pen supplied by Evans, he reported to Miller by telephone that "every bill [Adams] handed me is showing up brown."

[47] See id.

[48] *Means,* supra.

Although there was a claim at the scene that Elliott's bills had a "funny" color, this claim originated from Evans. Nothing in the record shows the cashier to have been a reliable source for analyzing color variations in currency.

The majority posits that Johns and Miller invoked their training in determining that probable cause existed. But Johns deposed, "I've never had formal and/or informal training on [counterfeit money detection pens]." Further, he testified that he had no formal training whatsoever in detecting fake money. While the majority credits him with having obtained "informal" training, Johns clarified in his deposition that his exposure to the subject consisted only of "another experienced officer pointing things out." Johns further specified that even these tips were limited to the examination of newer money, such as checking that the front, center pictures on bills are offset and that the bills contain watermarks. But with respect to bills such as the ones in this case, Johns testified, "I don't remember covering anything from the old bills." Thus, Johns's "informal training" added nothing to "the facts and circumstances within the arresting officers' knowledge" pertinent to the situation at hand.[49] It provided no "reasonably trustworthy information . . . sufficient in [itself] to warrant a man of reasonable caution" to believe that an offense was being committed.[50]

Similarly, Miller deposed that he had no formal training in detecting counterfeit bills. Although he had been involved in investigating counterfeit cases, he plainly stated that he had never been called upon to identify counterfeit money. And regarding the only counterfeit case he could remember, he stated, "[I]t didn't take a whole lot to discover [that bill] was counterfeit." It involved "a one-dollar bill that had the corners, if you will, of a hundred-dollar bill cut off, taped on there and then had run it through a color copier and then trimmed out." Miller could not recall any other "on-the-job" training. He could not recall any publication he had read dealing with identifying counterfeit money. He asserted that he had picked up some tips from "talk[ing] to some agents about counterfeit money . . . like Secret Service, FBI agents," although he could not recall the names of any of those agents. Essentially, those tips centered on comparing a questioned bill with a known bill. But at the scene that day, there was no known series 1950 bill available for Miller to employ this method. Finally, Miller admitted that, as of the date of the incident, he was unfamiliar with the use and limitations of the counterfeit detection pen. Thus, Miller's "informal training" added

---

[49] Id.
[50] Id.

nothing to "the facts and circumstances within the arresting officers' knowledge" pertinent to the situation at hand.[51] It provided no "reasonably trustworthy information . . . sufficient in [itself] to warrant a man of reasonable caution in the belief that an offense" was being committed.[52]

Johns and Miller might have been advised that counterfeit currency was being passed at the Mall. But the fact that counterfeit currency had been presented at the Mall does not make every shopper who presents currency subject to arrest.[53] The law enforcement officers needed to have had reasonable grounds to believe that the particular bills at issue in this case were counterfeit.[54] The officers did not.

Johns was alerted upon his arrival that the sheriff's department had been summoned because a pen had failed to show that Elliott's bills were authentic. The pen and/or its package instructed that the pen had no utility on bills predating 1959. Johns had both the pen and a pen package. Evans pointed out to Johns that the bills were dated 1950. Neither Johns nor Miller had training — formal or informal — with respect to such older bills. Evans's analysis of the currency was not reliable. And Miller's comparison technique lacked a known bill of the same age.

Under these circumstances, no reasonably prudent person would have begun prosecution without further inquiry. The officers were without any reliable means to determine whether the bills were authentic, and there is no showing of a "necessity of prompt action" in the nature of immediate arrests.[55] Furthermore, there was evidence that additional information was available and that it could have been obtained without difficulty. The sheriff's department had on staff an officer with extensive, formal training in the detection of counterfeit currency. This officer, Hawk, deposed that he was available for questions that arose with regard to his expertise. In addition, the record shows that Adams and Elliott complied with the law enforcement officers' requests to hand over their driver's licenses. And there is no evidence that either had a history of or reputation for engaging in any criminal activity. Finally, Johns was given an explanation by Elliott regarding how she came into possession of the old bills. Therefore, there was no probable cause to arrest Adams and Elliott for forgery.

---

[51] Id.

[52] Id.

[53] See *Henry v. United States*, 361 U. S. 98, 103 (80 SC 168, 4 LE2d 134) (1959).

[54] Id.

[55] See *Melton*, supra.

The majority concluded otherwise and thus did not reach the trial court's rulings that the doctrine of sovereign immunity barred liability as to Johns, Miller, and Carlisle and that the doctrine of official immunity barred liability as to Johns and Miller. Sovereign immunity applies to counties and protects county employees who are sued in their official capacities.[56] Sovereign immunity is waived, however, by any legislative act that specifically provides that sovereign immunity is waived and the extent of such waiver.[57] Appellants rely on OCGA § 15-16-5, which provides, "The sheriffs shall give a bond in the sum of $25,000.00, which amount may be increased in any county by local Act, conditioned for the faithful accounting for all public and other funds or property coming into the sheriffs' or their deputies' custody, control, care, or possession." Although this court has determined that the requirement of the posting of bond under OCGA § 15-16-5 waives sovereign immunity for acts and omissions that come under the bond coverage,[58] the conduct underlying the claims asserted against Johns, Miller and Carlisle in their official capacities does not fall under the bond coverage.[59] Because appellants have failed to show waiver of the defense of sovereign immunity with respect to these claims, the trial court's grant of summary judgment to Johns, Miller and Carlisle in their official capacities was proper.[60]

Johns and Miller were also sued in their personal capacities, and the trial court determined that official immunity barred these claims.

> The doctrine of official immunity, also known as qualified immunity, offers public officers and employees limited protection from suit in their personal capacity. Qualified immunity protects individual public agents from personal liability for discretionary actions taken within the scope of their official authority, and done without wilfulness, malice, or corruption. Under Georgia law, a public officer or employee

---

[56] *Banks v. Happoldt*, 271 Ga. App. 146, 147 (1) (608 SE2d 741) (2004).

[57] *Gilbert v. Richardson*, 264 Ga. 744, 748 (3) (452 SE2d 476) (1994).

[58] *Cantrell v. Thurman*, 231 Ga. App. 510, 514 (4) (499 SE2d 416) (1998).

[59] Compare *Jackson v. Norton*, 75 Ga. App. 650, 652-654 (1) (44 SE2d 269) (1947) (where earlier version of law now codified at OCGA § 15-16-5 provided that sheriffs post bond conditioned "for the faithful performance of their duties as sheriffs, by themselves, their deputies, and their jailers," false arrest could be a breach of the condition of a sheriff's official bond, where the false or malicious arrest was done colore officii).

[60] See *Banks*, supra; *Anderson v. Cobb*, 258 Ga. App. 159, 160 (1) (573 SE2d 417) (2002); *Cantrell*, supra.

may be personally liable only for ministerial acts negligently performed or acts performed with malice or an intent to injure.[61]

Deciding to arrest is a discretionary act.[62] Thus, Johns and Miller were entitled to official immunity unless they acted with actual malice, defined as "a deliberate intention to do wrong."[63] Because Adams and Elliott have failed to make this requisite showing, the trial court's grant of summary judgment to Johns and Miller in their individual capacities on the claims of malicious prosecution, false imprisonment, and false arrest was proper.[64]

## Case No. A05A1837

2. I agree with the majority's conclusions that Evans and LGC were not entitled to summary judgment on the claims of false imprisonment, false arrest, and malicious prosecution, that Blackburn cannot be held liable on those claims, and that the LGC Defendants were entitled to summary judgment on the issues of slander and tortious misconduct.[65] I agree with the majority's determination that the grant of summary judgment to the LGC Defendants on the issues of conversion, intentional infliction of emotional distress, and punitive damages stands as uncontested.

However, I disagree with the majority's conclusion that the LGC Defendants were entitled to summary judgment on appellants' claims of negligence. The majority's conclusion was based upon a finding that probable cause existed. As Division 1 of this opinion states, this finding was erroneous. Moreover, these defendants — including Blackburn — knew or certainly should have known that the tool, which the store chose to employ as a counterfeit detection device, had no utility with respect to the bills Elliott presented.

## Case No. A05A1838

3. I agree with the majority's decision in Division 7, which concludes that neither CPG nor Grayson was entitled to summary

---

[61] *Standard v. Hobbs*, 263 Ga. App. 873, 875-876 (1) (589 SE2d 634) (2003) (citation and punctuation omitted).

[62] *Anderson*, supra.

[63] See *Merrow v. Hawkins*, 266 Ga. 390 (467 SE2d 336) (1996) (distinguishing "actual malice" from " 'implied malice', a term which has been defined to mean conduct exhibiting a 'reckless disregard for human life' ").

[64] See id. at 392; *Anderson*, supra at 160-161 (2); see generally *Franklin v. Consolidated Govt. of Columbus*, 236 Ga. App. 468, 471 (1) (512 SE2d 352) (1999).

[65] As stated above, I concur in the judgment only as to these claims.

judgment on the claims of false imprisonment, false arrest, and malicious prosecution, but that Wallace was entitled to summary judgment on these claims. And I agree with the majority's decision in Division 8, which concludes that neither CPG nor Grayson was entitled to summary judgment on the issues of intentional infliction of emotional distress and punitive damages, but that Wallace was entitled to summary judgment on these issues.

In Division 9, the majority concludes that the CPG Defendants cannot be held liable under a negligence theory. This conclusion is based on the determination that probable cause existed for the appellants' arrests. As stated, I believe that the record shows no probable cause. While conduct underlying allegations of false imprisonment and false arrest may give rise to a claim of negligence,[66] I find summary judgment appropriate here.

The record shows that Evans called the Mall's security personnel and reported that the women were passing counterfeit bills; Grayson and Wallace responded to Evans's call; Grayson told Evans to call the police; and Grayson thereafter pointed out Adams and Elliott to Johns. The appellants claim that the CPG Defendants breached a duty by "allow[ing] a patron to be injured, i.e., arrested or imprisoned, based on an erroneous or inaccurate accusation of criminal activity." However, the appellants have failed to establish that a duty arose under the circumstances of this case for the security guards to halt the police investigation, thwart the subsequent arrests of Adams and Elliott, or otherwise alter what occurred.

I am authorized to state that Chief Judge Ruffin and Judge Barnes join in this opinion.

DECIDED MARCH 30, 2006 —
RECONSIDERATION DENIED APRIL 13, 2006 — ■

*Larry D. Wolfe, Mark A. Yurachek*, for appellants.
*Jason C. Waymire, Terry E. Williams*, for appellees (case no. A05A1836).
*Finley & Buckley, James B. Finley, Karen S. Focia*, for appellees (case no. A05A1837).

---

[66] See *Stewart v. Williams*, 243 Ga. 580, 581 (1) (255 SE2d 699) (1979) (while false imprisonment is an intentional tort, where the confinement is due to the defendant's negligence, the latter may be liable as for negligence, but the claim is then governed by the rules and principles of the tort of negligence); *Corporate Property Investors v. Milon*, 249 Ga. App. 699, 705 (2) (549 SE2d 157) (2001) (physical precedent only).

*Gray, Rust, St. Amand, Moffett & Brieske, Michael J. Rust, Matthew L. Hilt*, for appellees (case no. A05A1838).