## A00A2500. HOLMES v. ACHOR CENTER, INC.
### (547 SE2d 332)

RUFFIN, Judge.

This is the latest manifestation of an ongoing dispute involving Kenneth R. Holmes, Achor Center, and the United Baptist Church (UBC), relating to the use of certain property owned by Achor.[1] In this case, Holmes sued Achor, asserting four separate counts of malicious prosecution. Count 1 relates to his arrest on June 11, 1993, for simple assault; Count 2 relates to his June 14, 1994 arrest for criminal trespass; Count 3 relates to his June 30, 1994 arrest for aggra-

---

[1] See *Holmes v. Bd. of Commrs.*, 271 Ga. 206 (517 SE2d 788) (1999); *Anderson v. Dowd*, 268 Ga. 146 (485 SE2d 764) (1997); *Holmes v. Achor Center*, 242 Ga. App. 887 (531 SE2d 773) (2000); *United Baptist Church v. Holmes*, 232 Ga. App. 253 (500 SE2d 653) (1998); *Achor Center v. Holmes*, 219 Ga. App. 399 (465 SE2d 451) (1995).

vated stalking; and Count 4 relates to his June 30, 1994 arrest for criminal trespass. The trial court granted summary judgment to Achor on Counts 2 and 4 on February 18, 1998, and on the remaining two claims on July 28, 1999. For reasons discussed below, we affirm the grant of summary judgment as to Count 2, but reverse the trial court's rulings on the remaining counts.

Many of the background facts regarding this dispute can be found in the various opinions issued by this Court or the Supreme Court.[2] Achor is a nonprofit organization that provides shelter and training to homeless and destitute women and children. In 1989, Achor purchased certain real estate from the Christian Coalition of Metropolitan Atlanta (CCMA), which had previously purchased the property from UBC. At the time of Achor's purchase, the property was subject to a "joint-use" agreement between CCMA and UBC. The agreement, which continued after Achor purchased the real estate, gave UBC the right to conduct religious services on a portion of the property.[3]

In 1988, UBC selected Holmes to lead a separate ministry, known variously as the Mission Church, Capitol Community Church, or Capitol View Mission. This ministry, which conducted a noon worship service, became known as the noon congregation.[4] Although Holmes, as minister of the noon congregation, was a UBC staff and church member, those who joined the noon congregation were apparently not admitted to membership in UBC.

After Achor purchased the property, disputes arose when Achor complained that Holmes had repeatedly entered its women's dormitory without permission. At its quarterly meeting on May 2, 1993, UBC terminated Holmes as pastor and expelled him from membership in the church.[5] Holmes refused to recognize this expulsion, however, contending that the vote was invalid because a quorum was not present.[6] He and other members of the noon congregation continued to return to Achor's property in an effort to hold services. From that point onward, the various parties have been embroiled in seemingly endless legal disputes.

On June 11, 1993, Achor directed its maintenance supervisor, Mark Matthews, to remove Holmes' name from the UBC sign on the property. After Matthews removed the name, Holmes came onto the property and objected to the removal. An altercation ensued, and

---

[2] See cases cited at footnote 1, supra.

[3] See *Achor Center v. Holmes*, supra at 399; *Holmes v. Achor Center*, supra at 887-888.

[4] UBC held its own services at 9:30 a.m. on Sundays. *Anderson v. Dowd*, supra at 146.

[5] See *Achor Center v. Holmes*, supra at 399-400; *United Baptist Church v. Holmes*, supra at 254.

[6] See id. at 254-256; *Achor Center v. Holmes*, supra at 400.

Holmes was arrested for simple assault.

On June 13, 1993, Holmes was arrested for criminal trespass after entering the property in an attempt to hold church services.[7] Holmes sued Achor and UBC for malicious prosecution in connection with this arrest. The trial court denied the defendants' motions for summary judgment, but we reversed the trial court's orders in *Achor Center v. Holmes* and *United Baptist Church v. Holmes*, holding that Achor and UBC had probable cause to believe Holmes was guilty of criminal trespass. In *United Baptist Church v. Holmes*, we also refused to question the validity of Holmes' termination and expulsion from membership in UBC, as that involved "a controversy relating to the faith, teaching, doctrine, and discipline of the church."[8]

Two of Achor's officers, Joyce Dorsey and Penny Wood, testified in this case that Holmes continued to come onto Achor's property in 1994, despite being warned that he was trespassing. The evidence shows that Holmes entered the Achor property on June 13, 1994. Wood notified Dorsey and contacted the police. Wood testified that an officer advised her to have Achor swear out a warrant against Holmes for criminal trespass. Wood relayed this information to Dorsey, and on June 14 the two of them swore out a criminal trespass warrant against Holmes, who was later arrested. On June 24, 1994, Achor obtained a temporary restraining order preventing Holmes from coming within 50 yards of the property. The order also prevented Holmes from "following, stalking, surveiling or threatening employees or residents of [Achor]" and provided that "a violation will be treated as an act of aggravated stalking in violation of [a] court order."

Late at night on June 30, 1994, Holmes drove past Achor's property, parked his car at a house immediately behind the property, and entered the house.[9] Achor notified the police, and Officer D. Quinn came to the property to investigate. Quinn was provided a copy of the restraining order and determined that Holmes was in violation of the order. An Achor employee, Valencia Cousin, told Quinn that Holmes had threatened her "at the property." Quinn arrested Holmes for criminal trespass and aggravated stalking.

1. In his first enumeration, Holmes contends that the trial court lacked authority to consider Achor's second motion for summary judgment with respect to Counts 1 and 3, since the court had previously denied Achor summary judgment on these counts and we had refused to review that interlocutory decision. Relying on *Harris v.*

---

[7] *United Baptist Church v. Holmes,* supra at 254-256.
[8] (Punctuation omitted.) Id. at 254.
[9] UBC apparently owned the house.

*Harris*,[10] Holmes asserts that denial of an application for interlocutory review constitutes an adjudication on the merits. This assertion is completely without merit, as *Harris* has nothing to do with interlocutory appeals, but instead deals with discretionary appeals. While denial of an application for discretionary appeal of a final judgment may constitute an adjudication on the appeal's merits,[11] denial of interlocutory review does not constitute an adjudication on the merits. Rather, it may simply reflect that we "decided the case should be concluded in the court below before entertaining the appeal, so as to avoid a piecemeal or fragmented appeal."[12]

2. In four enumerations, Holmes contends the trial court erred in granting summary judgment to Achor on each count of malicious prosecution.

To prove a claim of malicious prosecution, a plaintiff must show (1) that he was prosecuted for a criminal offense under a valid warrant, accusation, or summons; (2) that the prosecution was instigated without probable cause; (3) that the prosecution was instigated with malice; (4) that the prosecution has terminated favorably to the plaintiff; and (5) that the prosecution has caused damage to the plaintiff.[13] In reviewing the trial court's grant of summary judgment, we view the facts in a light most favorable to Holmes.[14]

(a) *Count 2: June 14, 1994 criminal trespass arrest.* In granting summary judgment to Achor on Count 2, which involves Holmes' June 14, 1994 criminal trespass arrest, the trial court relied in part on the doctrine of collateral estoppel, holding that Holmes was precluded from relitigating certain issues relating to probable cause. Holmes contends that the trial court erred in relying on collateral estoppel and that Achor lacked probable cause to instigate his arrest. For reasons discussed below, we disagree.

The doctrine of collateral estoppel

> precludes the re-adjudication of an issue that has previously been litigated and adjudicated on the merits in another action between the same parties or their privies. Like res judicata, collateral estoppel requires the identity of the parties or their privies in both actions. However, unlike res judicata, collateral estoppel does not require identity of the claim — so long as the issue was determined in the previous action and there is identity of the parties, that issue may not

---

[10] 245 Ga. 75, 76 (263 SE2d 113) (1980).

[11] See *Henderson v. Justice*, 237 Ga. App. 284, 287 (1) (514 SE2d 713) (1999).

[12] See *C & S Nat. Bank v. Rayle*, 246 Ga. 727, 731 (273 SE2d 139) (1980).

[13] *Achor Center v. Holmes*, supra at 400 (1).

[14] See *Holmes v. Achor Center*, supra at 887 (1).

be re-litigated, even as part of a different claim. Furthermore, collateral estoppel only precludes those issues that actually were litigated and decided in the previous action, or that necessarily had to be decided in order for the previous judgment to have been rendered. Therefore, collateral estoppel does not necessarily bar an action merely because the judgment in the prior action was on the merits. Before collateral estoppel will bar consideration of an issue, that issue must actually have been decided.[15]

In granting summary judgment to Achor, the trial court noted that Holmes had previously sued Achor for malicious prosecution arising out of his June 13, 1993 arrest for criminal trespass. Although the trial court in that case denied Achor's motion for summary judgment, we reversed, holding that Achor had probable cause to believe that Holmes' coming onto the property constituted criminal trespass. We reasoned as follows:

> Holmes admits that after his expulsion [from UBC], he was not welcome at the Achor facility and Achor officials clearly communicated that to him. Holmes' deposition testimony reflects that, a few days prior to his arrest, Achor removed from its property the church sign that contained Holmes' name. Holmes confronted the individual removing the sign and their exchange grew so heated that the police were summoned. By his own admission, Holmes perceived the sign's removal as an indication that he was without authority to enter Achor's property. Achor also changed the facility's locks to prevent Holmes' entry to the property, another act that Holmes considered part of a "continuing effort" to bar him from the property. Finally, as he stated in an affidavit given prior to his arrest, Holmes heard an Achor chairperson, Joyce Dorsey, openly and unequivocally state that Holmes was not to return to Achor's property. In light of the above, when Holmes subsequently appeared on Achor property, Achor could reasonably believe that Holmes knowingly entered its property without consent and was thus guilty of criminal trespass.[16]

Our decision established that Holmes had been warned not to enter the property and that Achor thus had probable cause to believe that

---

[15] (Footnotes omitted.) *Waldroup v. Greene County Hosp. Auth.*, 265 Ga. 864, 866-867 (2) (463 SE2d 5) (1995).

[16] (Footnote omitted.) *Achor Center v. Holmes*, supra at 400-401 (1).

he had committed criminal trespass. In granting summary judgment to Achor in this case, the trial court concluded that "Achor's criminal trespass warning to [Holmes] has remained in effect since his arrest for criminal trespass on June 13, 1993 . . . , [Achor] never having consented to or having given [Holmes] authority to re-enter its property."

Holmes claims that the trial court erred in relying on our prior decision, asserting that events occurring after the 1993 arrest "put [Achor] on notice that Holmes was not a trespasser." In particular, Holmes asserts that (1) the criminal trespass charge arising out of his June 13, 1993 arrest was ultimately dismissed; (2) a temporary restraining order entered against Holmes in July 1993 was dissolved in November 1993; (3) Achor had supposedly been told by police officers that the dispute between the parties was civil and not criminal; and (4) Dorsey was "aware that certain members of [UBC] were unsuccessful in its [sic] attempt to restrain Holmes from the property."[17] None of these facts, however, indicates that Holmes actually had a right to come onto the property or that Achor lacked probable cause to believe that it had validly forbidden Holmes from entering its property. Indeed, we have already rejected Holmes' claim that he had a legal right to enter the property because UBC improperly expelled him from the church. In *United Baptist Church v. Holmes*, we determined that we could not question the validity of Holmes' expulsion.[18]

Because the evidence undisputably shows that Holmes was forbidden from entering Achor's property, Achor had probable cause to believe that his unauthorized entry on June 14, 1994, constituted criminal trespass.[19] Accordingly, the trial court did not err in granting summary judgment to Achor on this claim.

(b) *Count 1: June 11, 1993 simple assault arrest.* Count 1 of the complaint is based on Holmes' arrest for simple assault on June 11, 1993. As discussed above, this arrest arose out of an altercation

---

[17] With respect to this final contention, the order referenced by Holmes simply denied UBC's application for an interlocutory injunction preventing all members of the noon congregation from coming within 100 yards of the church property. The order stated that UBC failed to prove "an immediate and urgent need for action by the Court" and noted that UBC had "not demonstrated that the members of the congregation are agents of Rev. Holmes or are acting in active concert with him." The order in no way suggested that Holmes had a legal right to be on the property; indeed, it specifically stated that he was under a temporary restraining order in a different case. Holmes makes several other allegations in his brief that are simply untrue or not supported by the record. For example, he states that Dorsey "was instructed by a Superior Court judge that Achor could not bar Holmes from the property" and cites Dorsey's deposition as support. The cited portion of Dorsey's deposition testimony, however, does not support this assertion.

[18] *United Baptist Church v. Holmes*, supra at 254.

[19] See *Achor Center v. Holmes*, supra.

between Holmes and Matthews, an Achor employee who removed Holmes' name from a marquee sign on the property. After Matthews finished removing the plastic letters, Holmes appeared on the property and objected to the removal. According to Matthews, Holmes was "very agitated and angry." Fearing for his safety, Matthews handed Holmes the letters, and Holmes returned to his car, loudly proclaiming, "I am going to get my gun." Matthews reported this incident to Wood, who called the police.

Holmes submitted an affidavit in which he claimed that Matthews threatened him with a pair of bolt cutters and that he then went into the church office and called the police. He testified that "[a]t no time did I threaten Matthews stating 'I'm going to get my gun.'" He further claimed that he told the arresting officer that he had not threatened Matthews with a gun. Holmes' wife submitted a similar affidavit, indicating that she witnessed the incident.

The arresting officer, Anthony Smith, also submitted an affidavit. He testified that he interviewed Matthews, who told him that Holmes had "walked back to his vehicle loudly threatening to get his gun." Smith asked Matthews whether Holmes' actions caused him to fear for his life, and Matthews responded affirmatively. According to Smith, another witness at the scene also told him she had heard Holmes say he was going to get his gun. Smith stated that he then interviewed Holmes, who "admitted . . . that he did tell Mr. Matthews that he was going to get his gun out of the trunk of his car, but only after Mr. Matthews had threatened him with a set of bolt cutters." Smith found Matthews' version of events to be more credible, in part because Holmes' "unusually aggressive and belligerent manner . . . undermined his credibility." Smith arrested Holmes, concluding that Holmes "had caused the disturbance by threatening Mr. Matthews." Smith testified that no one asked him to arrest Holmes and that he made an "independent and uninfluenced" decision to arrest based on Matthews' statements and his own observation of Holmes' behavior.

Holmes argues that Matthews provided Officer Smith with false information by telling Smith that Holmes threatened him with a gun. He claims that this false information influenced Smith's decision to arrest Holmes for simple assault. Achor, by contrast, argues that a malicious prosecution claim is barred because "Matthews . . . merely relayed the facts to Smith, who then made an independent decision to arrest Holmes."

As we stated in *Ginn v. C & S Nat. Bank*,[20]

> [t]he law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute. In the former case there is potential liability for . . . malicious prosecution; in the latter case there is not. It is clear, though, that initiation of the criminal action need not be expressly directed by the party to be held liable. . . . Of course, if the informer knew that the facts stated were false, it is clear that he attempted to influence the officer's judgment and he is, therefore, responsible for such subsequent action as may be taken.[21]

Thus, "[a] person may be held liable for unduly influencing the decision to prosecute by providing information that is known to be false, misleading or materially incomplete."[22]

It is clear that Officer Smith's decision to arrest Holmes was based in large part upon Matthews' assertion that Holmes threatened him with a gun. Holmes, however, testified that he made no such threat. For summary judgment purposes, we must view the facts in the light most favorable to Holmes, and we therefore must conclude that there is evidence Matthews knowingly made a false statement to Officer Smith.[23] Accordingly,

> [a] jury *could* conclude from these facts that [Matthews] knew that his information was erroneous, that he thereby attempted to influence the [officer], and therefore that he and [Achor] are liable for instigating the prosecution.[24]

---

[20] 145 Ga. App. 175 (243 SE2d 528) (1978).

[21] (Citations and punctuation omitted.) Id. at 178 (3).

[22] *Brooks v. H & H Creek, Inc.*, 223 Ga. App. 635, 637 (1) (a) (478 SE2d 451) (1996).

[23] Although Smith stated that Holmes *admitted* telling Matthews that he was going to get his gun, Holmes and his wife both testified that they told Smith he did *not* threaten Matthews with a gun. Although we see no reason to question Officer Smith's credibility, the fact remains that credibility determinations are the function of the factfinder, not this Court. Since accepting Officer Smith's version of events requires rejection of versions presented by Holmes and his wife, we cannot say the evidence is undisputed that Holmes made any such admission to the officer.

[24] Achor did not raise in its summary judgment motion the issue of whether it can be held liable for Matthews' actions in providing false information to the police. Accordingly, to defeat the motion, Holmes was not required to present evidence that Matthews' actions were "within the range of employment and for the purpose of accomplishing business authorized by the employer." *Roberts v. Duco Dev.*, 229 Ga. App. 549, 550 (494 SE2d 313) (1997). See *Hodge v. SADA Enterprises*, 217 Ga. App. 688, 689 (1) (458 SE2d 876) (1995).

Admittedly, close scrutiny of the [evidence] may make it seem unlikely that [Holmes'] version of the facts would prevail before a jury. But the movant for summary judgment carries the burden to eliminate material issues of fact, and where material issues can be eliminated only by making credibility judgments, the movant has not met his burden.[25]

Because there was evidence from which a jury could conclude that Achor's employee improperly influenced Officer Smith to arrest Holmes for simple assault, the trial court erred in granting summary judgment to Achor on this count.[26]

(c) *Count 3: aggravated stalking arrest on June 30, 1994.* Count 3 of Holmes' complaint relates to his June 30, 1994 arrest for aggravated stalking. This arrest occurred at the same time as Holmes' June 30, 1994 arrest for criminal trespass. When Officer Quinn arrived at the scene, an Achor employee, Cousin, informed him that Holmes had threatened her. Quinn then arrested Holmes for criminal trespass and aggravated stalking.

During her deposition, Cousin admitted that she told the police officer that Holmes had threatened her. She further testified, however, that Holmes in fact did not say anything to her that night. She said that she called Wood before talking with the police officer and that Wood instructed her to tell the police that Holmes had threatened her. She testified that she felt bad about telling the police Holmes had threatened her when he had not. She also testified that, at Wood's behest, she signed an affidavit falsely accusing Holmes of threatening her on a different occasion.

Viewed in the light most favorable to Holmes, a jury could find that Wood instructed Cousin to make a false statement to Officer Quinn and that this false statement led Quinn to charge Holmes

---

[25] (Emphasis in original.) *Ginn v. C & S Nat. Bank,* supra at 178-179 (3).

[26] Achor's claim that this count was barred by res judicata is without merit. Although Holmes could have asserted this count in his prior malicious prosecution lawsuit arising out of his June 13, 1993 criminal trespass arrest, he was not required to do so.

[O]ur law does not require that [a plaintiff] assert every separate claim for relief that he may have against the defendant in one single lawsuit or risk losing the claim for relief forever, as would be the case if our joinder statute provided for mandatory rather than permissive joinder. Instead, our law requires that such a plaintiff must bring every claim for relief he has concerning the *same subject matter* in one lawsuit. He may join several claims for relief arising out of different subject matters in one lawsuit but he is not required to do so and will not be penalized for making a strategic decision to the contrary.

(Emphasis supplied.) *Lawson v. Watkins,* 261 Ga. 147, 149-150 (2) (401 SE2d 719) (1991). The prior lawsuit involved whether Holmes had authority to be on the property on June 13, 1993, not whether he had made threats of violence on an earlier occasion.

with aggravated stalking.[27] The trial court erred in granting Achor summary judgment on this count.

(d) *Count 4: June 30, 1994 criminal trespass arrest.* The trial court similarly erred in granting summary judgment on Count 4 of Holmes' complaint, which relates to the June 30, 1994 criminal trespass arrest. Officer Quinn testified that when he arrived at Achor's property, an Achor employee provided him with the June 24, 1994 temporary restraining order prohibiting Holmes from coming within 50 yards of Achor's property. Quinn spoke to Cousin, who told him that Holmes was at the Achor property and threatened her that night. Quinn also discussed the situation with Holmes. According to Holmes, "Quinn stated that Valencia Cousin represented to him that I had come on Achor's property and threatened her." Based on his observations and findings at the scene, Quinn concluded that "Holmes had been and was in violation" of the temporary restraining order. He arrested Holmes for criminal trespass "when it became apparent . . . that [Holmes] had entered or come within 50 yards of the property."

Quinn's testimony is unclear. He *may* have arrested Holmes based on his own observation that Holmes had violated the temporary restraining order by coming within 50 yards of Achor's property. But he *may* have based the arrest on Cousin's statements that Holmes actually entered the property. In fact, the police report states that Holmes "was placed under arrest for criminal trespass for being on church property." Achor similarly notes in its brief that Holmes was arrested "for coming onto the property." At her deposition, Cousin admitted telling police that she saw Holmes on Achor's property. She further testified, however, that Holmes did not actually enter the property that night; he simply drove by. Holmes himself denies that he came onto the Achor property on June 30, 1994.

Viewed in a light most favorable to Holmes, this evidence raises material issues of fact regarding the grounds for the June 30, 1994 criminal trespass arrest and whether a false statement from Cousin influenced that arrest. A jury or other factfinder could conclude that a false statement led Quinn to determine that Holmes entered the

---

[27] We note that Cousin's testimony in this regard was somewhat equivocal and was given in response to leading questions by Holmes. For example, when asked if Wood instructed her to tell the officer that Holmes threatened her, Cousin first responded, "I can't recall that." Upon further questioning, however, she responded, "Yes." We also note that, by the time she gave her deposition testimony, Cousin had been fired from her job by Wood, and she admitted that she was bitter. Questions relating to witness credibility, however, are for the factfinder, For summary judgment purposes, we must construe Cousin's testimony in the light most favorable to Holmes.

property, causing him to arrest Holmes.[28] Summary judgment on Count 4, therefore, was improper.[29]

*Judgment affirmed in part and reversed in part. Andrews, P. J., and Ellington, J., concur.*

DECIDED MARCH 20, 2001 —
RECONSIDERATIONS DENIED APRIL 12, 2001 — 

Kenneth R. Holmes, *pro se.*
*Jennings, Sparwath & Satcher, Milton B. Satcher,* for appellee.

---

[28] Achor did not argue on summary judgment that it should not be liable for any false statements made to the police by Cousin. See footnote 23, supra.

[29] See *Ginn v. C & S Nat. Bank,* supra. We disagree with Achor's argument that collateral estoppel and/or res judicata support summary judgment on Count 4. A factual dispute remains as to whether Holmes actually entered Achor's property on June 30, 1994. The prior determination that Holmes was not authorized to enter the property, therefore, does not permit summary judgment on this claim. Furthermore, Holmes was not required to join this claim in his prior malicious prosecution suit arising out of the June 13, 1993 criminal trespass arrest. See *Lawson v. Watkins,* supra.