**FOURTH DIVISION**
**DOYLE, P. J.,**
**MILLER and BOGGS, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules/

**July 16, 2013**

# In the Court of Appeals of Georgia

A13A0671. THE KROGER CO., INC. v. BRIGGS.

MILLER, Judge.

Najah Briggs sued The Kroger Co. for negligence, among other claims, based on its actions that led to his arrest for attempting to pass allegedly counterfeit money. In fact, the money was not counterfeit and Briggs was ultimately cleared of any wrongdoing only after being arrested and jailed, losing his job, being denied his seniority and other ramifications. The negligence claim was presented to a jury and they concluded that Kroger was negligent and awarded Briggs $500,000 in damages. Kroger moved for a directed verdict during trial and filed a motion for judgment notwithstanding the verdict after trial. Kroger appeals the denial of those motions and its motion for summary judgment on the negligence claim. We conclude that the

evidence was sufficient to support the jury's verdict and that the summary judgment ruling is moot. Thus, we affirm.

> In its review of the denial of a motion for judgment notwithstanding the verdict, this Court is to determine whether there is any evidence to support the jury's verdict. This same standard of appellate review is to be applied in the situation of the denial of a motion for a directed verdict or a motion for new trial on general grounds. In so doing, this Court must construe the evidence in a light most favorable to the prevailing party in the court below.

(Citations omitted.) *Patterson-Fowlkes v. Chancey*, 291 Ga. 601, 602 (732 SE2d 252) (2012).

Construed in favor of Briggs, the evidence at trial showed that on August 19, 2009, Briggs was running errands before going to work and stopped at a Kroger store. He needed change for a $100 bill so that he could pay for his dry cleaning. Briggs shopped for a few minutes and then went to the self checkout to pay for the items he had selected. After scanning his items, he attempted to pay with the $100 bill, but the machine would not accept the money. Briggs told the attendant in the self checkout area what had happened and she directed him to the customer service desk.

Briggs went to the customer service desk, explained what had happened, and asked for change for the $100 bill. After Briggs handed the bill to the customer

service representative, he saw her mark the bill with a black pen. She then told him that she would have his change for him soon. The representative waited on a few other customers before heading into a back office. Briggs saw the store manager, Bobby Reeder, go into the back office with the customer service representative, and they stayed there for several minutes. The representative then opened the door to the back office and told Briggs that there was a delay because they had been locked out of the safe and that they would have his change shortly. Although Briggs had smaller bills in his wallet, the representative never asked him for another form of payment.

While Briggs thought he was waiting for his change, Reeder made a determination that the bill was counterfeit and called 911. He told the operator that he had a guy trying to pass a counterfeit bill and asked them to send the police. Reeder's determination was based solely on the fact that the counterfeit detection pen used by the customer service representative had left a mark on the bill. Reeder did not know that the pen came with instructions and never made any attempt to determine whether there were any instructions indicating on which bills the pen would work. The bill that Briggs submitted for payment was a series 1950c bill, and the pen used on it was not able to determine whether a 1950 bill was counterfeit.

Kroger had certain procedures in place to address the issue of counterfeit money. A risk specialist for Kroger testified that, using information obtained from a U.S. Secret Service website, he prepared a document instructing Kroger employees on the steps to follow if presented with a bill the employee suspects may be counterfeit. Those steps included:

1. Make the customer aware of your suspicion concerning the suspect document.

2. Compare the bill with one you KNOW is genuine.

3. NEVER accuse the customer of intentionally attempting to pass the suspect document.

4. Ask the customer if they know where they received the suspect document.

5. Request another bill or form of payment. Offer the customer the use of the store phone to contact police if they wish.

A separate memorandum addressed to front end managers discussed what to look for and how to handle being confronted with suspected counterfeit money. In that memorandum, managers were informed that if a bill turns black when marked with a counterfeit detection pen, it is "SUSPECT ONLY." The cashiers or office

personnel were instructed to call a floor supervisor or management person to handle the situation. The memorandum further provided that "[t]he customer simply needs to be asked if they have another bill or form of payment. There is no need to contact the authorities unless the customer is presenting a large number of counterfeit bills. . . . The average consumer, in all probability, would not recognize a bogus bill." According to the risk specialist, both documents were in effect for the Kroger store Briggs visited in 2009, and Reeder should have been aware of their contents.

Reeder testified that he recognized the documents , but admitted that he did not follow the instructions in either. Reeder made no attempt to speak with Briggs before calling the police and did not compare the bill to one he knew was genuine. Nor did Reeder look at the date on the bill because he considered that to be irrelevant. Reeder did understand that by calling 911 and asking the operator to send the police, it was possible that they would arrest Briggs.

The risk specialist testified that although store managers have discretion in these situations, the preferred course of action is for them to contact the risk management department before calling the police. If Reeder had called the risk specialist in this situation, the risk specialist would not have contacted the police. Kroger also had a policy in place that store managers were expected to notify risk

management personnel of incidents in their stores, but neither Reeder nor anyone else at his store ever told risk management that Briggs had been arrested for having an allegedly counterfeit bill.

Briggs's first indication that anything was wrong was when a uniformed police officer approached him and told him that he was being arrested for forgery for having a counterfeit bill. Briggs was not given any opportunity to explain or to offer another method of payment. Instead, Briggs was handcuffed and threatened with the use of a taser gun if he did not cooperate. When the officer asked where he had obtained the money, Briggs explained that he had received it from his mother-in-law and that she had obtained the money from a bank on Jonesboro Road. Briggs was transported to the Clayton County jail where he was photographed and fingerprinted, required to put on prison clothing, and placed in a cell. Briggs remained in jail for 31 hours.

The arresting officer's testimony was presented by deposition. When asked why he went to the Kroger store, the officer testified that

> [t]he manager or customer service representative had gotten a hundred dollar bill at the customer service counter that they had tested with a pen, with one of the money detect pens that they said turned black, which was an indicator for them that it was counterfeit. They also noticed some inconsistencies with it, so they believed it was a counterfeit bill and they called 911, so I responded.

6

The officer, who had some in-house training on counterfeit detection but no formal instruction, noted some inconsistencies on the bill. Based on his conversation with the customer service representative and possibly the store manager, as well as his personal observations of the bill, the officer arrested Briggs.

Briggs was charged with first degree forgery and hired a criminal attorney to defend him. After Briggs paid the attorney $1,500, the first degree forgery charges were dismissed in 2009.

At the time of his arrest, Briggs was employed by Allied Barton and worked 40 hours a week for them at a rate of $11.00 per hour. He missed two days of work while he was in jail, and was terminated from his job because he had been arrested for a felony. After the forgery charges against him were dismissed, Briggs sought to return to his job at Allied Barton. The position he formerly held had been filled and there were no other positions available at that location.

Although Briggs was able to return to Allied Barton in January 2010, it was for less pay and he was required to reapply, submit to another background check, and go through another probationary period. The contract at that location ended in March 2012, and he was not able to find another position at Allied Barton. Briggs testified

7

that he wanted to continue working for Allied Barton because the company had a good reputation and provided good benefits and because he really enjoyed the job.

Briggs's former supervisor testified that Briggs was a very capable employee and that he would hire him again if he could. The supervisor also testified that he would have kept Briggs on at his initial position if he had not been arrested and that he would have recommended Briggs for promotion if a position was available. A higher level position with higher pay did come available at that location after Briggs left. Briggs sought more than $700,000 in lost future earnings, as well as other damages.

After Briggs presented his case, Kroger moved for a directed verdict on the claims for negligence, punitive damages, and future lost earnings. The trial court denied the motion on the negligence and future lost earnings claims, but granted it on the punitive damages claim. At the close of the evidence, Kroger renewed its motion for directed verdict on the negligence claim, asserting that it was not the proximate cause of any harm suffered by Briggs, and on the future lost earnings claim. The trial court denied the motion entirely.

After deliberating briefly, the jury returned its verdict in favor of Briggs for $500,000.

Following the trial, Kroger filed a motion for judgment notwithstanding the verdict or, in the alternative, motion for new trial. Kroger argued that it had not been negligent and that even if it had been negligent, the police officer's decision to arrest Briggs was the intervening proximate cause of the damages alleged by Briggs. The trial court denied the motion , and Kroger appeals.

1. Kroger contends that the trial court erred in denying its motions for directed verdict and for judgment notwithstanding the verdict on the negligence claim. We disagree and conclude that the evidence was sufficient to support the jury's verdict.

To recover on his negligence claim, Briggs had to show "(1) a legal duty to conform to a standard of conduct; (2) a breach of this duty; (3) a causal connection between the conduct and the resulting injury; and (4) damage." (Citation and punctuation omitted.) *Greenway v. Northside Hosp.*, 317 Ga. App. 371, 380 (2) (730 SE2d 742) (2012). On appeal, Kroger challenges only the causation element, arguing that the uncontroverted evidence showed that its actions were not the proximate cause of Briggs's damages because the arresting office independently found probable cause to arrest Briggs.

It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the

9

plaintiff, an independent, intervening, act or omission of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's act, and which was sufficient of itself to cause the injury. But, if the character of the intervening act claimed to break the connection between the original wrongful act and the subsequent injury was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act.

(Citations and punctuation omitted.) *Greenway*, supra, 317 Ga. App. at 381 (2).

Here, Kroger's own policy stated that there was no need for an employee to contact the authorities unless the customer was presenting a large number of counterfeit bills. Notwithstanding this policy, Reeder decided that the bill was counterfeit and contacted 911, stating that he had someone trying to pass a counterfeit bill and asking them to send the police. Reeder also admitted that it was foreseeable that Briggs would be arrested when the police were called to the store. Thus, the evidence showed that, but for Reeder's actions, the police would not have come to the Kroger store and Briggs would not have been arrested.

10

Moreover, contrary to Kroger's argument, the uncontroverted evidence did not show that the responding police officer conducted an investigation independent of any exhortations on Kroger's part. Notably, the officer testified that he relied on his own observation *and* information supplied by Kroger in concluding that he had sufficient probable cause to arrest Briggs. Furthermore, Briggs testified that he was standing at the customer service counter when he was unexpectedly approached by officers and that within seconds, he was arrested for counterfeiting, was handcuffed and searched, *and then* was questioned. Thus, even assuming that an officer's independent investigation can constitute a defense to a negligence claim, as opposed

11

to an intentional tort claim for false imprisonment or malicious prosecution,[1] such a defense did not shield Kroger from Briggs's negligence claim in this case.

The applicable standard is whether there is any evidence to support the jury's verdict. Here, the evidence showed that Kroger was negligent in failing to follow its

---

[1] Briggs also asserted claims for false arrest and malicious prosecution, however, those claims did not proceed to trial and are not before this Court on appeal. Nevertheless, we note that in cases involving false arrest or malicious prosecution,

> the law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute. In the former case there is potential liability for false imprisonment or malicious prosecution; in the latter case there is not. . . . If the defendant . . . merely states what he believes, leaving the decision to prosecute entirely to the uncontrolled discretion of the officer, or if the officer makes an independent investigation, or prosecutes for an offense other than the one charged by the defendant, the latter is not regarded as having instigated the proceeding; *but if it is found that his persuasion was the determining factor in inducing the officer's decision, or that he gave information which he knew to be false and so unduly influenced the authorities, he may be held liable.*

(Citations and punctuation omitted; emphasis supplied.) *Welton v. Ga. Power Co.*, 189 Ga. App. 17, 20 (2) (375 SE2d 108) (1988).

12

own policies regarding the handling of suspected counterfeit money. Moreover, there is some evidence showing that the officer did not conduct an independent investigation before arresting Briggs. Accordingly, the evidence was sufficient for the jury to find that Kroger's actions were the proximate cause of Briggs's injuries.

The cases Kroger cites in support of its argument are distinguishable. In citing these cases, Kroger attempts to suggest that it was not the proximate case of Briggs's injuries, and that the officer's actions were the direct cause of the incident. This is not the case as demonstrated by the evidence.

In *Baggett v. Nat. Bank & Trust Co.*, 174 Ga. App. 346 (330 SE2d 108) (1985), Baggett was arrested and detained as a suspected bank robber when he presented a deposit slip to the teller that, unbeknownst to him, had the words "This is a stek up" on the back. Id. The teller reported the note, completed Baggett's transaction, and Baggett left the bank without taking anything that did not belong to him. Id. The police were called via a silent alarm activated by the bank manager. Id. They arrested Baggett and detained him for several hours before releasing him without lodging any formal charges against him. Id. at 347. This Court concluded that the bank was entitled to summary judgment on Baggett's negligence claim because the evidence showed no misconduct. Id. at 348 (2). Here, however, there was evidence that Reeder

13

violated company policy on how to deal with suspected counterfeit money and that if he had followed company policy, Briggs would not have been arrested. See *Medley v. Home Depot, Inc.*, 252 Ga. App. 398, 401 (555 SE2d 736) (2001) (summary judgment not appropriate where jury could determine that Home Depot was negligent for failing to follow its own policies); *Schofield v. Hertz Corp.*, 201 Ga. App. 830, 831 (1) (412 SE2d 853) (1991) ("Violations of private guidelines do not establish negligence per se, but can be illustrative of what is considered reasonable behavior for employees.") (citation omitted). Further, in reaching his determination that the bill was counterfeit and relaying that information to the 911 operator, Reeder admittedly relied solely on the counterfeit marking pen without making any effort to determine whether that type of pen worked only on certain bills.

Kroger also relies on *First Union Bank of Georgia v. Daniel*, 186 Ga. App. 826, 827-828 (2) (368 SE2d 768) (1988). In that case, someone fraudulently opened an account in Daniel's name at First Union and wrote checks without funds to cover them. Id. at 826. First Union returned the checks to the merchants stamped either "account closed" or "insufficient funds." Id. When First Union discovered that Daniel had not uttered the worthless checks, it notified the sheriff's department, provided them with a photograph of the person who had written the checks, and requested that

14

the sheriff's department notify the merchants to whom the checks were written. Id. at 827 (1). Daniel was nonetheless arrested. In that situation, this Court held that Daniel's arrest was not caused by the bank's actions in stamping the returned checks, but by the sheriff's department acting despite its knowledge that Daniel was not the person described in the warrants. Id. at 827-828 (2). Thus, any negligence on the bank's part was cured by its subsequent actions, and was not the proximate cause of Daniel's arrest. Id. Here, however, Kroger did not attempt to cure any negligence on its part.

The cases cited by Kroger do not alter our conclusion that there was evidence to support the jury's verdict. The jury's verdict must therefore be upheld.

2. Kroger asserts an alternative claim – if this Court remands the case to the trial court for a new trial based on lack of proximate cause and damages attributable to Kroger, we should instruct the trial court not to allow the future lost wages claim to go to the jury. Given our determination in Division 1 that the jury's verdict should be upheld, we need not reach this alternative claim.

3. Kroger also challenges the trial court's denial of it motion for summary judgment on the negligence claim. The trial court's denial of Kroger's motion for summary judgment on this claim was an interlocutory ruling which was reviewable

15

only by certificate of immediate review and an application for interlocutory review. See *Thomas v. McGee*, 242 Ga. 441, 442 (1) (249 SE2d 242) (1978). There is no record evidence that Kroger followed interlocutory application procedures to obtain review before the case proceeded to trial. After a verdict and judgment it is too late to review an order denying summary judgment as that order becomes moot. *Kicklighter v. Woodward*, 267 Ga. 157, 162 (4) (476 SE2d 248) (1996); *Rowe v. Law Offices of Ben Brodhead, P.C.*, 319 Ga. App. 10, 17 (3) n.7 (735 SE2d 39) (2012).

*Judgment affirmed. Doyle, P. J., concurs. Boggs, J., concur*s *specially.*

# In the Court of Appeals of Georgia

A13A0671. THE KROGER CO., INC. v. BRIGGS.

BOGGS, Judge, concurring specially.

While I agree that we must affirm in this case, I would do so for a reason different than that relied upon by the majority and I therefore concur specially as to Division 1. And, while the majority has adopted part, but not all, of the analysis in this special concurrence, I write to address the merit of extending the rule providing for a defense in false arrest, malicious prosecution, and false imprisonment cases - where an official makes an independent decision to arrest or prosecute - to negligence cases. Nevertheless, because jury questions exist here as to the applicability of this defense, I would affirm under the specific circumstances of this case.

The negligence count in Briggs' complaint alleged that Kroger "negligently" failed to follow "its own management's advice, guidance, suggestions and/or directives where counterfeit currency is suspected," and that as a result of such

negligence Briggs "was unlawfully detained and arrested for first degree forgery." The majority concludes that Kroger's actions were the proximate cause of Briggs' injuries by focusing exclusively on the alleged negligence of Kroger in failing to follow its own guidelines. Briggs' damages, however, would flow not from Kroger's failure to follow its guidelines, but from his ensuing arrest. And I would conclude that when a law enforcement officer conducts an independent investigation providing a basis upon which professional judgement is exercised in deciding to arrest a suspect, independently of any exhortations by the defendants, that act alone, where uncontroverted, would constitute a defense to such a negligence claim. This defense should be available in any negligence case sounding in false arrest, such as the one before us, even though the plaintiff casts their theory of recovery as one arising from a defendant's alleged negligence in failing to follow its own established guidelines.

"The law draws a fine line of demarcation between cases where a party directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relays facts to an official who then makes an independent decision to arrest or prosecute." *Jacobs v. Shaw*, 219 Ga. App. 425, 426 (1) (465 SE2d 460) (1995), overruled on other grounds, *Infinite Energy v. Pardue*, 310 Ga. App. 355 (713 SE2d 456) (2011). And it is well-settled that there can be no liability

2

against a defendant who contacted law enforcement officers to report a suspected

crime when the officer exercises his or her own professional judgment in arresting the

plaintiff.[1] While this rule has generally been applied in cases involving the intentional

torts of false arrest, malicious prosecution, and false imprisonment, its application has

not been expressly limited to intentional torts. I would therefore conclude that the

same rule should also be applied in cases asserting a negligence theory of recovery

---

[1] *Hammond v. D. C. Black Inc.*, 53 Ga. App. 609 (186 SE2d 775) (1936) ("Where a person calls police officers to his place of business where there is a man he suspects of having committed a crime, and the officers come, and after taking in the situation arrest the suspected person, and the arrest is illegal, the person calling the officers is not guilty of an illegal arrest where he does not direct or request the making of the arrest, notwithstanding he may acquiesce in the arrest and do nothing to prevent or discourage it."); *Barnette v. Coastal Hematology &c.*, 294 Ga. App. 733, 736 (670 SE2d 217) (2008) ("[A] defendant may successfully defend against a claim of malicious prosecution when the arresting officer provides an uncontroverted affidavit that the decision to arrest plaintiff was made solely by him in the exercise of his professional judgment and independently of any exhortations by the defendants." (Citation and punctuation omitted.)); *Holmes v. Achor Ctr.*, 249 Ga. App. 184, 190-191 (1) (b) (547 SE2d 332) (2001); *Corporate Property Investors v. Milon*, 249 Ga. App. 699, 701 (1) (a) (549 SE2d 157) (2001) (physical precedent only) ("Had the evidence revealed that [the officer], in fact, made an independent investigation, as was her professional duty to do, and based her decision to arrest [the plaintiff] on her independent investigation and the statements of [another], then there would be a basis upon which professional judgment was exercised, and such would constitute a defense.")

3

for damages flowing from an arrest,[2] because it is in fact a defense which would defeat recovery.

As we have held in malicious prosecution actions, the public policy of this state is "to encourage citizens to report an individual they suspect may have committed crimes." *Achor Ctr. v. Holmes*, 219 Ga. App. 399, 402 (1) (465 SE2d 451) (1995); see also *K-Mart v. Coker*, 261 Ga. 745, 747-748 (4) (410 SE2d 425) (1991). "Citizen cooperation is essential to efficient police operation and should not be stifled." (Citations omitted.) *Baggett v. Nat. Bank & Trust Co.*, 174 Ga. App. 346, 348 (2) (330 SE2d 108) (1985). A party who reports a suspected crime should not be held liable for either an intentional tort *or* for negligence (especially a negligence claim sounding in false arrest), when the officer arriving on the scene conducts his own

---

[2]In *Adams v. Carlisle*, 278 Ga. App. 777 (630 SE2d 529) (2006), two store patrons alleged, among other things, a negligence claim against the corporate defendants whose employees contacted police to report the patrons' passing of suspected counterfeit bills. Id. at 778-781. We concluded that because "the facts could have led a reasonable person to believe that probable cause existed to arrest the appellants for passing counterfeit bills," their negligence claim fails. Id. at 787-788 (3) (b) and 793 (9) (binding precedent with regard to these divisions). But our opinion did not expound on whether probable cause to arrest is a defense to negligence or whether it vitiates an element of negligence, and if so, which element. Kroger has not asserted here that probable cause precludes the appellants' negligence claim.

4

investigation and determines that in his professional judgment he has probable cause to arrest.

The public has a clearly stated role in aiding law enforcement in combating crime, particularly in matters of counterfeit bills where, as the recipients of counterfeit notes, their role is vital.[3] When presented with a suspect note, as here, it is reasonably foreseeable that by calling the police, someone might be arrested. However, it is likewise reasonable to conclude that upon their arrival, the police will do their job and conduct an independent investigation to determine whether probable cause exists for arresting a person. Certainly, Kroger was within its right to expect that law enforcement will not arrest someone falsely. Accordingly, there appears to

---

[3] It appears from the record that Kroger's disseminated counterfeit currency policy entitled "KNOW YOUR MONEY" was prepared from the same information located on the "Know Your Money" page on a website maintained by the United States Secret Service. http://www.secretservice.gov/know_your_money.shtml. The policy of the United States Secret Service for combating counterfeit bills is aptly stated on this page: "Only with the public's cooperation can the United States Secret Service reduce and prevent these crimes." Id. It also asks the public to "[c]ontact your local police department or United States Secret Service field office" if a note is suspected to be counterfeit. http://www.secretservice.gov/money_receive.shtml. Finally, a "Counterfeit Note Report" instructs in bold print within a section titled "Important Notice" that the person surrendering the suspected counterfeit bill should "**TELEPHONE the local police department or Secret Service office IMMEDIATELY** and hold the note." (Emphasis in original.) http://www.secretservice.gov/forms/ssf1604.pdf.

be no logical basis to preclude the defense provided in false arrest, malicious prosecution, and false imprisonment cases from also applying to negligence theories of recovery, particularly when, as here, the negligence claim sounds in false arrest.

Nevertheless, under the specific facts in this case, there was conflicting evidence on the issue of whether the officer actually conducted an independent investigation. And there was some evidence from which the jury could have concluded that there was exhortation on the part of Kroger. In short, this evidence was not uncontroverted. The officer testified that to conclude he had sufficient probable cause to arrest Briggs he "relied on [his] own observation and [ ] relied on information supplied by Kroger." Briggs, on the other hand, testified that while he was standing at the customer service counter, he was unexpectedly approached by the officers, and within seconds told that he "was being arrested for forgery, of counterfeiting," handcuffed, searched, and then questioned. And the manager admitted that in his 911 call played for the jury he stated: "I have a guy trying to pass a counterfeit bill." For this reason only, I believe that the trial court's denial of Kroger's motion for directed verdict and motion for judgment notwithstanding the verdict, was not in error.